WILLIAM H. LAIRD et al.

*v.*

THE ATLANTIC COAST SANITARY COMPANY.

[Submitted July 17th, 1907.   Decided July 17th, 1907.]

1. The operation of a crematory and fertilizer plant, in which ordinary garbage and other waste matter are subjected to a burning process, and the residue, in the shape of ashes, used in connection with other elements to make a fertilizer, in such a manner that, under certain conditions of the atmosphere and direction of the wind, the smoke arising from the cremation and odor due to the method of handling the elements of the fertilizer compels those residing within a distance of from two thousand to two thousand five hundred feet to keep their windows closed, and renders their houses uncomfortable for habitation, and prevents them from sitting out of doors, constitutes a nuisance.

2. That a crematory and fertilizer plant was established and maintained with the consent of the municipal authorities does not warrant its operation in such a manner as to create a nuisance.

3. Persons residing in the neighborhood of a proposed crematory and fertilizer plant did not attempt to enjoin the construction thereof on the ground that it would create a nuisance. The amount of offensive matter dealt with at first was small, and the resultant nuisance correspondingly slight. Subsequently, and after carrying on his business for six or seven years, the same was increased, by a contract with the municipal authorities to dispose of the entire waste material of the city, to such an extent that the smoke and odor coming therefrom rendered uncomfortable for habitation houses within from two thousand to two thousand five hundred feet thereof.—*Held*, that persons affected by the nuisance were not guilty of such laches as to estop them from maintaining a bill to abate or enjoin the same.

On final hearing on bill, answer and proofs.

*Mr. Winfield S. B. Parker* and *Mr. George W. Van Gelder,* for the complainants.

*Mr. Thomas P. Fay,* for the defendant.

4

PITNEY, ADVISORY MASTER.

The object of the bill is to abate or enjoin a nuisance in the shape of noxious odors alleged to be diffused through the air partly by means of smoke and partly in the ordinary mode.

The complainants are residents and severally owners of property in the extreme northerly part of the territorial limits of the borough of Long Branch.

The defendant has for the last six or seven years been engaged in the business of the disposal of the ordinary house garbage and kitchen waste, coal ashes, the contents of old-fashioned dry privy vaults, and of cesspools. For this purpose it has a plant occupying about one acre of land, more or less, situate in the most northerly corner of the corporate limits of Long Branch.

The plant was established there by the consent of the municipal authorities. It consists of what is called a "crematory," in which the ordinary garbage, including half decayed meat, and dead animals and the like, are subjected to a burning process, and the residue, in the shape of ashes, is used in connection with the night soil collections and ordinary stable waste to make a fertilizer. It is the smoke arising from this cremation which, it is alleged, is offensive as smoke in that neighborhood.

The contents of the privy vaults are collected principally in the winter time, but occasionally in the summer, and deposited in a shallow earthen pit and covered and mixed with ordinary stable manure and straw, and allowed to ferment and rot, and, being mixed with the ashes from the crematory, constitutes the fertilizer.

The contents of the cesspools are brought to the plant in tank wagons and emptied into a large cesspool, from which the liquid soaks away gradually into the ground and also evaporates, and what does not soak away or evaporate runs over into a small tidal stream which rises in the immediate neighborhood.

The allegation of the complainants is that the liquid cesspool, and the mode of dealing with the contents of privy vaults, tends to create and does create and give off an offensive odor.

Another ground of complaint is that in gathering up ashes from dwellings and hotels a large amount of garbage, including the heads and entrails of chicken and fish and other waste animal matter, is mixed with the coal ashes. This mixture is dumped on the low ground forming a part of the defendant's plant, and, being there exposed to the sun, gives off a strong odor of carrion flesh.

An immense amount of evidence was given on both sides upon the effect of the operation of the defendant's plant in the matter just stated, covering first, the actual production of the noxious odors, vapors and smoke, and second, the distance in which it was felt to an appreciable and offensive degree. I shall not here go into a discussion in detail of this evidence. While it was being given I had before me a map of the neighborhood, with the residences of the different complainants accurately marked thereon, and with a scaled ruler in my hand I fixed in my mind approximately the distance from the crematory in each case and had it entered on the stenographer's notes. Of course that distance to which the odor reached varied with the strength and direction of the wind. When the air was rare, or in common language "heavy," the smoke from the crematory tended to quickly subside, and its presence was at once made known by its smell. And so with the smells from the handling of the elements of the fertilizer on the surface of the earth. With the same rare condition of the atmosphere, and the wind blowing in the direction of these dwellings, both these sources of offensive odors were clearly distinguishable a distance of from two thousand to two thousand five hundred feet in an air line.

Naturally the odor from the fertilizing plant proper was more pungent immediately on the plant than at a distance, while on the contrary there was very little smell from the crematory smoke at and near the plant, it being carried to a considerable height by a smokestack and naturally would not be observed until it became cool and began to descend.

Previous and up to the spring of 1906 the plant was maintained by the patronage of such residents as chose to employ it. But in the spring of 1906 the defendant made a contract with

the municipal authorities of Long Branch to gather in, remove and dispose of the waste material from the whole town, including the contents of dry privy vaults, cesspools, kitchen garbage and house waste, including small paper and packing boxes and other inflammable material, and coal ashes and dead animals wherever found.

This undertaking cast a large burden on the defendant and taxed the capacity of its works by a sudden increase of work.

The population had been in the habit of casting into their back yards their coal ashes and kitchen waste and garbage in one pile, and when this was drawn out and spread on the ground in the sun it became decidedly offensive.

The municipality passed an ordinance requiring the inhabitants to keep the garbage separate from the coal ashes. This was naturally difficult to enforce and was, in fact, only partially enforced. Then there was proof tending to show that there was carelessness on the part of the employes of the defendant in maintaining the separation of these matters in their transport from the dwellings to the disposal plant, so that the nuisance arising from the putrid odors arising out of the ash bank continued to a greater or less extent throughout the whole summer season of 1906.

Then with regard to the privy vaults and cesspools. Naturally enough, so long as the inhabitants were obliged to pay for the cleansing and removal of the contents of those receptacles they were liable to allow them to be improperly clogged, but when and as soon as they could be relieved of the putrid contents at the expense of the city through the agency of the defendant, it became the duty of the defendant, as well as the pleasure of the inhabitants, to have them thoroughly cleansed as soon as practicable. The result was, as before remarked, that a great increase of work was put upon the defendant by its contract with the city made in the spring of 1906.

With regard to the character for offensiveness and the intensity of the odor. The complainants and their families are not over sensitive people, but plain, every-day folk, and their evidence must be considered accordingly. Their evidence was that in the conditions of the atmosphere and the direction of

the wind, which I have mentioned, and especially and mainly in warm weather, the odor was very unpleasant, so much so that they felt constrained to close their windows and keep them closed. They were rendered uncomfortable both at their meals and when sitting in their houses and on their piazzas in the summer time.

This situation of things is serious. They have the right to have the air come to them in a state of ordinary purity so that they can comfortably enjoy, during the hot months, the ordinary currents of air.

In all these cases it is a question of degree. In this case the evidence satisfies me that the degree of intensity was such that ordinary plain people would be rendered uncomfortable by it.

The conclusion at which I have arrived is that the defendant's works, as they were conducted in the summer of 1906, both before and immediately after the filing of the bill, created a nuisance of which each one of the complainants has a right to complain and from which they have a right to be relieved and protected by this court.

Of course the fact that the defendant had the permission of the municipal authorities to establish and maintain its plant cannot sanctify or justify the defendant in creating a nuisance. It is not within the power of the municipality to authorize any conduct which would produce that result. *Simmons* v. *Paterson, 58 N. J. Eq. (13 Dick.) 1; S. C., on appeal, 60 N. J. Eq. (15 Dick.) 385.* The distinction was there taken between riparian proprietors on tidal streams and riparian proprietors on streams above tide, and it was held distinctly that the legislature could not, as against the latter class of riparian owners, authorize the pollution of the waters of the Passaic river by the city of Paterson without providing for just compensation.

The case cannot be classified or put on a level with the ordinary trades which are more or less objectionable to nearby residences, such as green grocers, fish and meat markets. See *Ross* v. *Butler, 19 N. J. Eq. (4 C. E. Gr.) 294; Cleveland* v. *Gas Light Company, 20 N. J. Eq. (5 C. E. Gr.) 201; Duncan* v. *Hayes, 22 N. J. Eq. (7 C. E. Gr.) 25,* for a statement of the

degree of discomfort which will warrant the interposition of this court.

It was argued by the defendant that the complainants had been guilty of laches in preferring their complaint. I am unable to perceive the least ground for this defence. Palpably, if they had filed their bill while the crematory was being constructed they would have been met, precisely as they are here, by the assertion that the works would not result in any nuisance and the court would not have interfered. The amount of offensive matter dealt with by the defendant was naturally at first very small, and the resultant nuisance correspondingly slight. In fact the complainants were willing to give the defendant a chance to demonstrate the harmless character of its works. They first applied to the board of health and, failing to get relief there, came to this court. It does not appear that the defendant took any irretrievable steps in reliance upon complainant's acquiescence. There is not the least ground for estoppel.

The serious question in the cause, and the only one that gives me the least trouble, is as to the extent of the remedy. Ought the court at once to abate the nuisance radically by stopping all further operations, or ought it simply to enjoin the defendant from continuing the nuisance in terms that will not stop its operation, but permit it to proceed at its peril.

The taking of evidence extended over a long period of time.

The bill was filed on the 29th day of August, 1906, with several ex parte depositions annexed.

The answer, with a large number of affidavits, was filed on the 11th day of September, 1906.

Further affidavits on the part of the complainants and the defendant were filed on the 18th of September.

The taking of testimony was commenced on the 13th of February, 1907, continued on the 14th, again on the 13th of March, on the 28th of March, and on the 25th of April.

The defendant, in giving its evidence on the later days, attempted to show to the court that it was making improvements in its works and mode of doing business which would result in making them innocuous.

On the other hand the complainant produced the evidence of a highly intelligent and apparently trustworthy expert who had examined the defendant's works, and who gave evidence tending to show that the crematory itself was incapable of being so conducted as not to give off offensive smoke. The theory of the affair is that the offensive matter shall be subjected to such an intense heat as to actually destroy all odors. The expert stated that this could only be done by subjecting them to a temperature of two thousand degrees and upwards, but he stated that the defendant's furnace was supplied with a cold air draught which prevented it from ever attaining such a degree of temperature, and that it would require to be supplied with what is known as the "hot blast" in order to make it effectual in this respect.

The furnace is somewhat complicated in its construction, and so arranged that the hot air is first driven under the garbage, &c., which is placed in a large cast-iron pan, the result of which first application is to dry it thoroughly. The evaporation from this drying process is drawn by a back draught downward through the fire and there supposed to be destroyed. When this is accomplished there is a shifting of certain dampers and the stream of hot air is driven over the iron pan and its contents are incinerated. It is the resultant smoke that has been found to be offensive.

In order to be effective the fire must be made of thoroughly dry wood and kept up to a steady blaze and heat, and the dampers must be kept in perfect order and adjusted with watchful care.

The evidence satisfies me, and in fact it was admitted, that these processes were not, at all times, conducted in a perfect manner, with the result that it was proven and admitted by the defendant that on those occasions the smoke was offensive.

It was quite impossible to distinguish on all occasions just what the situation of affairs was when the smoke became offensive. And this was natural enough when we consider that if the air was clear, and a fine breeze blowing in a northwesterly direction, the smoke was carried quite away from the neighborhood, and if it were foul it was not discernible. As

before observed, it was only in·certain conditions of the atmosphere, and when the wind was in·certain directions, that the odor became ·offensive.·

My individual· opinion· is that· the defendant will find it very difficult, if not impossible, to· conduct· the crematory· in its present condition in such a manner ·as not at times to create a nuisance, nevertheless I feel disposed·to give it·the opportunity and not to require at first the stoppage of its use.

With regard to the handling of the various materials on the ground, I feel some degree of confidence that if proper care is exercised in· dealing with the offensive material the defendant will be ·able to avoid any serious injury to ·its neighbors.   At any rate, as in· the other matter, I am willing to give it the opportunity to attempt it for the present season.

I will advise a decree declaring that at and before the filing of the bill the defendant's works were so conducted as to create and maintain a nuisance as to each and every one of the complainants, and that the defendant be and is enjoined and restrained from further continuing its works in such manner as to injure and annoy the complainants and each of them. ·

The complainants are entitled to their costs and a counsel fee to be fixed on notice.

I ·will add that the evidence tended to show that proper care in collecting and carrying these offensive matters along the street to the crematory plant was not exercised, and that some of the individual complainants suffered from foul matter being dropped in the streets in the neighborhood of the defendant's plant.   But these matters were not within the scope of the bill and only affected a few of the complainants, and are not made in any degree the base of my judgment.   They are peculiarly in the jurisdiction of the municipality. ·