W. F. MITCHELL et al., Appellees, v. FLYNN DAIRY COMPANY, Appellant.

**NUISANCE: Smoke—Pollution of Atmosphere—Insufficiency of Showing.** Smoke, attending the operation of a plant, which does not unreasonably inconvenience the neighborhood, does not constitute a nuisance. (Sec. 5078, Code, 1897.)

PRINCIPLE APPLIED: The plant was provided with a smoke consumer of apparently late design. The smoke stack was 90 feet high. No inconvenience from smoke resulted except (a) on very still days, or (b) rainy days, when the soot settled on the clothes in nearby yards. On a very few occasions, for a brief time, black smoke was permitted to pass from the chimney, but it was quickly controlled. The complainant himself used soft coal in his furnace. *Held* not to constitute a nuisance.

**NUISANCE: Noises—Obscenity—Machinery—Noxious Odors.** The carrying on of a private plant in such a manner as to unreasonably disturb the sleep of the neighborhood (a residence part of a city) creates a private nuisance which may be abated. (Sec. 5078, Code, 1897.)

PRINCIPLE APPLIED: A dairy and ice cream plant, located in a residence neighborhood, was operated in some form during every hour of the day. 130 teams came and went each day, most of them passing through a public 14-foot brick paved alley west of the plant where they unloaded. The defendant had practically taken possession of this alley for the purposes of its business. One private residence, with one east door and five east windows, faced

the alley, only a few feet away. The loading and unloading of milk bottles and cans commenced about 1:30 A. M. and continued into the forenoon. Another unloading platform was on the east of the building. There was profanity and some obscenity among the teamsters about the plant. A steam exhaust added to the noise. An ice crusher, handling 350 tons of ice per month, added much to the noise. The congestion was so great at times that the sidewalk was used for unloading. The alley especially was offensive with manure. Residents 100 feet distant were disturbed. *Held,* to show a private nuisance.

**NUISANCE: Operation of Plant—Opportunity of Owner to Abate.**
3   The owner of a private plant should be given ample opportunity to so change the method of operating his plant that, the nuisance features may be avoided.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

SATURDAY, MARCH 13, 1915.

REHEARING DENIED WEDNESDAY, NOVEMBER 24, 1915.

SUIT in equity to enjoin the maintenance of a nuisance. The defense was a general denial. There was a decree for the plaintiffs. The defendant appeals.—*Modified* and *Affirmed.*

*Thomas A. Cheshire* and *Slipp & Perry,* for appellant.

*Howe & Lyon,* for appellees.

EVANS, J.—Since 1909, the defendant has been engaged in a branch of the dairy business. Its plant is located on Seventh Street and University Avenue, being on the south side of University Avenue and on the west side of Seventh Street. Its business at that plant consisted in collecting and distributing dairy products in the form of milk and cream and in the manufacture and sale of ice-cream in large quantities. The plaintiffs are owners of residences in the near vicinity of this plant. The operation of this plant involved the labor of many teams for the purpose of hauling milk and cream to and from the plant. The activities of the plant were

in operation in some form practically every hour of the night and day. The following plat will indicate the location of the plant and the residences of the plaintiffs:

The west end of the plant is upon the alley line. The buildings extend from University Avenue to the south line and cover about two thirds of the two lots owned by the defendant. The uncovered portion is that part that lies next to Seventh Street. Across the alley to the west is the residence of Jaderstrom. The east line of his house is about 4 feet from the alley line. The width of the alley is 14 feet. This residence has one east door and five east windows. The necessary hauling for the defendant has involved the coming and going of about 130 teams per day. Most of these pass through the alley in question. They stop at one point for

the purpose of unloading. This point is close to Jaderstrom's door. The teams then pass to the south, then turn to the left into the building and north along an inside driveway and out into University Avenue. They also drive the same route in a reverse direction. Sometimes, when there is congestion at the south end of the alley, the teams back out. On the east side of the buildings, there is also a short driveway without outlet. The teams drive thereon to an unloading window and platform and then back out again. The home of plaintiff Mitchell is located north of University Avenue, facing Seventh Street. His house is located on his north lot, which is 50 feet distant from University Avenue. The locality is a residence locality, but there is no residence facing north on University Avenue between Sixth and Ninth Streets, except that of Jaderstrom. On the north side of University Avenue, however, are many residences; and Seventh, Eighth and Ninth Streets are thickly occupied in that general vicinity.

The allegations of the petition which set forth the alleged nuisance character of the defendant's plant are very extensive. Nothing appears to have been omitted. The finding of the trial court for the plaintiffs was general in form and quite as broad as the allegations of the petition. The charge of nuisance is based mainly upon the following specifications: smoke from the chimney; foul odors of sour milk and the offal of horses; and noises. The noises complained of consist (1) of the profanity and obscenity of the teamsters; (2) of the steam exhaust; (3) of the icecrusher; (4) of the rattle of milk cans and bottles upon metal platforms and upon the cement walk; (5) of the rattle of wagons over the pavement. It is alleged, also, that the annoyance of such noises was emphasized by the fact that they occurred at unreasonable hours of the night. As to these alleged nuisance features, there is considerable conflict in the testimony. Before proceeding to a consideration of these, we must set forth the material undisputed facts. These are well epitomized in the brief of the appellant, as follows:

"The testimony shows, without dispute, that the plaintiffs, W. F. Mitchell and Louis W. Jaderstrom, were the owners of the real property described in the petition, the plaintiff Mitchell having resided upon his property for thirty years and the plaintiff Jaderstrom having bought his property a year and a half before he testified as a witness in the case, and paid $3,000 therefor, and with full knowledge of the conditions existing and surrounding the property he purchased for three years. The Flynn Dairy Company was the owner of the property described in the petition and occupied its property as a dairy and was engaged in the business of receiving sweet milk, sterilizing the same, and manufacturing, and delivering sweet milk and cream in sealed bottles to the retail trade in the city of Des Moines, Iowa. That it also made and delivered ice cream, sherbet, buttermilk and butter to the wholesale and retail trade of the city of Des Moines, Iowa; that the source of the supply of its milk was from the farmers in the immediate vicinity of Des Moines, some of it being delivered at Des Moines by railways and some of it by farmers' teams. That it had invested $100,000 in its plant, which was located about the center of the city of Des Moines, and was engaged in serving about 3,000 families daily with milk and cream products. That it also supplied hotels, restaurants, cafes, boarding houses and drug stores with milk products, and its gross sales at the time of this trial ran about $20,000 per month. The company had located its plant geographically in the center of the population so as to shorten the delivery system and to deliver its products quicker to the people; that there was a general custom in this city, and in other cities, with respect to the time of making deliveries, dependent upon the season of the year; that in the summer months, during the hot weather, it was the practice to deliver milk so the patrons would receive it before breakfast, and when the weather got cooler, so it was not necessary that its patrons keep ice, deliveries were made in the forenoon; that it was necessary to keep milk at a temperature below 50

degrees, and many families in the summer time did not buy
sufficient ice, or didn't have ice, to maintain this temperature
to keep the milk sweet, and for these reasons, during the hot
months, the milk had to be delivered to the people before
breakfast, and that about 9 out of 10 families used the milk
and cream that was delivered before breakfast; that it had
been the custom and practice of the Flynn Dairy, in respect
to the time of making its deliveries, beginning about the first
of May each year and terminating about the first of October,
to deliver milk before breakfast, and, from the first of October
to the first of May, to deliver its milk in daylight and before
noon.    The delivery wagons, from about the first of May to
October 1st, began to leave defendant's plant at 1:30 A. M.
and, at intervals of 10 minutes, 14 wagons left the plant;
that from the first of October to the first of May, the wagons
began to leave the plant between 4 and 5 o'clock in the morn-
ing and from then on to 7 or 8 o'clock, depending on the
weather.    The company has promulgated orders to its
employees and drivers orally that the drivers should walk
their horses within a block of the plant, and they should
refrain from any loud language on going to the plant or
leaving the plant in the early morning hours; that the last
of these 14 wagons left the plant approximately at 3 o'clock
in the morning; that, about 4 o'clock in the morning, a wagon,
delivering to the wholesale trade left the plant with deliveries
of milk and cream to cafes, restaurants and hotels in the
business district; that, about 5:30 in the morning, another
wagon for wholesale trade left the plant; that the ice cream
wagons were at the plant between 5 and 5:30 in the morning
in the hot summer months, in order that it may be delivered
to the drug stores; that the milk wagons began to return to
the plant about 6 o'clock and generally all returned by 8:30
in the morning during the summer time, and, during the
fall, winter and spring, they returned all the way between
11 o'clock in the forenoon to 3 or 4 o'clock in the afternoon.
In the summer time, in addition to these, there were 2 or 3

wagons called special ice cream and milk wagons that came and went throughout the day, beginning about 7 o'clock in the morning; that when the wagons return, after they have made deliveries to the houses, they bring back empty bottles, entering the plant upon an alley on the west side of the plant, and unload their empty bottles in what is termed an unloading window, in what is known as the center driveway in the plant, and occasionally the drivers unloaded their empty bottles on the sidewalk on University Avenue when the driveway in the rear was congested; that a truck was pulled out and the empties placed upon the truck, which was then wheeled into the building, and the empties were unloaded from the truck; that this unloading on the sidewalk on University Avenue was only done when the alley west of the plant was obstructed by teams. In July, 1913, the company used over 400 tons of ice, and in August, 380 tons of ice and most of this ice was ground; that in the forenoon, beginning at 8 o'clock and extending to 12 o'clock, farmers brought milk to the plant in tin cans, and the number of wagons and horses belonging to the farmers bringing in milk, at the time of the trial, was eight. This milk was unloaded in a short driveway on the east side of the Flynn Dairy Company's building.

"The milk came in 5- and 10-gallon cans. These cans were delivered by farmers to the receiving room, where they were dumped, weighed and washed, and the empty cans were returned to the farmers. That the site of defendant's plant had been formerly a heating plant. The size of the plot of ground is 100x133 feet, the buildings of the plant covering approximately two thirds of the ground, including the shed in the rear. This shed is about 22 feet wide, and one section of the building is about 100 feet deep. Part of the building is one story high and part two stories high. The west portion, or that portion known as the old North Des Moines Heating Plant, is two stories high, and that part of it is about 40x60 feet. The building stands on the southwest

corner of the intersection of University Avenue and Seventh Street and the alley on the west. The offices of the plant are in the northwest corner of the building. They consist of three rooms and occupy a space about 30 feet long and 20 feet wide. The northwest room is the manager's room and is about 9 feet square; to the south of that is a room 16 feet long, occupied by Miss Huston, the cashier, and one of the clerks. This room is about 9 feet by 16 feet in size. To the east of these two offices is the general office of the company. There is a door out of the manager's office leading out to University Avenue, and a door in the east side of the office leading to the general office, with a window on the west side, looking out on the alley. Miss Huston's room is enclosed in cement walls, with the exception that the east wall of her office is plastered about five feet up and then it is glass. The south wall in her room is of plaster, and there are two windows in her room that open out on the alley on the west. The door in the south partition opens into a women's toilet, with a small window in it and an upper window for ventilation, on the west. The main office has plastered walls, with the exception of the wall between that and Miss Huston's room. The main office has a door opening out on University Avenue on the north, with a door on the southwest corner and one to the southeast corner of the office, that opens into the plant. South of the ladies' toilet room is a men's toilet room, and the entry to the men's toilet room is from the plant. South of the main office is a boiler room, and across an open space, possibly 12 feet wide, is the entrance to the boiler room. The boiler room is below the surface. Even with the surface, and south of the boiler room, is what is called the butter room, or churn room. Outside of that, the west side of the plant is taken up with driveways; across the driveways to the east, beginning at the northeast corner, is the receiving room, where the milk is received. This room is about 12x18 or 20 feet in size. The floor in this room is elevated about 4 feet above the floor of the rest of the plant. West of that

is a small room about 8x10 feet in size, which was used for no particular purpose at the time of the trial. To the south of the receiving room is what is known as the milk room, where the milk is unloaded, and that room is about 24 or 30 feet long and 15 feet wide. To the west of that room is a room first where cream is pasteurized, and a tank to hold the cream. South of that is a bottle washing room. To the south of the milk room are the refrigerator rooms. The first refrigerator room is the milk refrigerator room, possibly 20 feet square, and south of that are the ice cream rooms, or hardening rooms. The first hardening room is for brick ice cream, and is about 10 feet wide and 12 feet long. To the south of that is the bulk ice cream hardening room, 8 or 10 feet wide and 12 or 15 feet long. To the south of that is the compressor room, where the ice compressor is, and the south wall of the ice compressor room is the south wall of the Flynn building on the south side of the lot. To the west of the ice cream refrigerator rooms and the compressor rooms is the ice cream manufacturing rooms, where the ice cream is manufactured.

"The shed extends from the west side of the paved portion of the public alley on the west, and runs south from University Avenue to the south line of the plant. Under this shed at the extreme end is a salt bin 10 or 12 feet square, with a brick floor in it. This bin is used for deposit of crushed rock salt. Next east of the salt bin is a large cement cooling tank, used in the ice cream department, which is about 6 feet wide, and 10 or 12 feet long, and about 4 or 5 feet high. It contains merely a big cement can. If the capacity of the artificial refrigerator in the summer time is not sufficient to pack ice cream in, this tank, to harden it for the trade, is packed with ice. Next east of this is where the machine known as a 'Creassey' ice crusher is stationed. This is run by electric power. The ice chunks as delivered are chopped into pieces and placed in this machine, which contains a drum with teeth. This drum rapidly revolves and, as it goes around, it breaks the ice into small pieces, on the principle of a coffee

mill. East of this machine is the ice storage room, about 10 feet square and 10 feet high, and holding 5 or 6 tons, when full. The ice machine is located about 30 feet east of the west end of the shed. The shed has a roof over it, the roof coming over within about two feet of the brick building, and is an over-hanging roof.

"There is no engine in the plant or about the plant. The machine power is from individual electric motors on each machine. In the plant is a 20-horse power boiler, in which 45 pounds of steam pressure is carried. The boiler is used for furnishing heat, hot water and steam only. The power to run the machines is obtained from the Des Moines Electrical Company.

"The latter part of October, 1912, the chimney of the plant was raised and a smoke consumer installed. This consumer is called the 'Chicago Board of Education No. 6', and was recommended to the defendant's plant by Proudfoot, Bird & Rawson. The height of the chimney, after this consumer was put in, is 90 feet from the fire box.

"The ice crusher begins to run at intervals about 5 o'clock in the morning and does not run later than 10 o'clock at night, with the exception of a time or two about July 4, 1913, when it was run a little later. The time of beginning and using this machine and quitting at night was fixed at the request of plaintiff, Jaderstrom.

"The alley on the west side of defendant's plant, and between the defendant's property and Jaderstrom's property, is a public alley, 14 feet in width, extending south from University Avenue 100 feet. A portion of this alley had been paved with brick by the defendant, the brick being laid in cement mortar. Teams could be driven into this paved portion of the alley, thence back to the rear of the building and out through the paved roadway through the center of the plant to University Avenue, or *vice versa.*

"The defendant keeps a retail store in the large or outer office, and from 25 to 30 customers a day come there for milk

products, and these customers are more largely women and children than men.

"Seventh Street, running north and south on the east side of defendant's property, and University Avenue, running east and west on the north side, are streets paved with brick, and vehicles of all kinds and the public travel along these streets at all hours of the day and night.

"On Sixth Avenue, one block east of Seventh Street, there is a double street railway track, with cars beginning to run at 6 or 6:30 o'clock in the morning and continuing until 11 o'clock P. M.. every six minutes, with so-called 'owl' service each hour thereafter until 6 or 6:30 the following morning. On Ninth Street, a block and a half west of the defendant's plant, there is a street railway line, with cars running every 8 minutes from 6 or 6:30 to 11 P. M. On Sixth Avenue, a car passes one way or another every 3 minutes, except during the owl service, and on Ninth Street, car passes every 4 minutes, from 6 or 6:30 in the morning to 11 o'clock P. M.

"There are business buildings at the intersection of University Avenue and Sixth Avenue, one block east of the defendant's property; also business houses at the intersection of Ninth and University Avenue; and on further north, three blocks, there is another business center at Forest Avenue and Sixth Avenue.

"There are business houses three blocks south of defendant, at Sixth and School, on every corner, and have been for several years; also at Ninth and School, two blocks west of Sixth and School, there are business houses, and have been for many years. At the southeast corner of Seventh and University Avenue, there is a vacant lot overgrown with weeds, which lot extends down to Sixth Avenue and has a billboard thereon. About a block south of University Avenue, on Seventh Street, running east and west, is a row of shanties built on an alley occupied by colored families, and this has been true for many years. At the southwest corner

of Eighth Street and University Avenue is a vacant lot over-
grown with weeds; and at the southeast of Eighth and Uni-
versity Avenue there is another vacant lot overgrown with
weeds.   A few feet just south of the defendant's property on
Seventh Street is, and has been for many years, a grocery
store, and on the west end of that lot is located a barn in
which horses are kept, and has been for many years.   On the
west end of plaintiff Mitchell's north lot, there is a barn, in
which horses have been kept, up to within a few months
before the bringing of this suit, and south of the barn, for a
distance of twenty or thirty feet running east and west, and
extending clear down to University Avenue, W. F. Mitchell
has, for many years, maintained a chicken yard, in which he
keeps on an average of 40 to 50 chickens, and this chicken
yard is within 20 feet of plaintiff Mitchell's house.   Most of
the lots in the vicinity of the plant, that are not herein
described as vacant or occupied by business houses, are occu-
pied by residences.   The plaintiff Jaderstrom burns soft coal
in his furnace.''

Manifestly, the case is one of great importance and prob-
able hardship to the defendant.   A careful reading of the
evidence satisfies us that a finding adverse to the defendant is
unavoidable.   The fact remains, however, that it is entitled
to a more definite finding than is contained in the decree en-
tered below, to the end that it may have an opportunity, at
least, to remedy, if possible, those features of its operation
of the plant which are found to constitute a nuisance.

I. On the question of smoke, it appears that, in October,
1912, the defendant installed an improved
smoke-consumer.   This installation caused the
extension of the smokestack to a height of 90
feet.   The testimony of Jaderstrom on the
subject of smoke is as follows:

1. NUISANCE:
smoke: pollu-
tion of atmos-
phere: insuf-
ficiency of
showing.

''The smoke was more noticeable at our house before they

extended the chimney upwards, and now the smoke does not bother us unless they have fired up and it is raining or very still; then the smoke will settle in the yard and on the clothes. When the atmosphere is still and the wind is not blowing, we notice it more. . . . I do not know when the dairy company raised its smokestack. I could not say. I have the impression it was raised this year, but I could not say. And since it has raised it this year, I am not troubled so much with smoke, except upon still days. It settled on the clothes, if my wife washes the clothes; that is, soot that comes from the chimney falls down in the vicinity where your clothes are. I burn soft coal in my chimney."

There is testimony that, on a very few occasions for a brief time, black smoke was permitted to come from this chimney, but it was quickly controlled. So far as appears, the fuel used in that part of the city is soft coal. Perhaps we ought to take judicial notice that the city is under an indivisible cloud of soft coal smoke which is a continuing nuisance, but the litigants are too loyal to the city to so contend. Upon the record before us, we do not think that the defendant should have been enjoined for maintaining a smoke nuisance since October, 1912.

II. On the question of odors, we think the evidence fairly shows that the defendant maintained the inside of its buildings in a sanitary condition and that there is no just ground for injunction by reason of odors arising from milk or cream, either sweet or sour. The plant was under the constant inspection of public authorities and does not seem to have been neglected in that regard; however, as to the odors arising from the offal and urine of horses used in the teaming, which will be later considered in another connection, a different situation is presented.

III. We have already set forth the general nature of the noises complained of in the petition. This branch of the case

discloses just grounds of complaint by plaintiffs.  In consider-
ing this question, two prominent facts of great
aggravation stand forth.  One is the night
operation of the plant, and the other is the use
of the west alley by the defendant.  This alley

2. NUISANCE:
noises : obscen-
ity : machin-
ery : noxious
odors.

was paved.  It was a public alley, but it was practically ap-
propriated by the defendant to its private use and thereby
made a part of its private plant.  The alley extended originally
to the south line of plaintiff's lots.  The defendant, however,
built a shed across the south end thereof.  The alley was so
connected with the building as to make a continuous drive
from the north end of the alley south, then east into the
buildings, then north along an inside driveway.  Bottles of
milk and cream were loaded or unloaded from the wagons
standing in this alley.  This work began at 1:30 in the morn-
ing and continued at short intervals into the forenoon.  The
teams thus standing were within a few feet of the sleeping
rooms in the residence of Jaderstrom.  Profane (and some-
times obscene) teamsters did their part to disturb all nearby
sleepers.  It is needless to argue that such a situation would
utterly destroy all opportunity for rest in such adjacent
dwelling.  On the east side was the other unloading platform,
and similar noises there disturbed the rest of the Mitchells,
100 feet away.  In addition to this, at various hours of the
night and day, was the steam exhaust and the operation of
the ice crusher.  Seven or eight hundred thousand pounds of
ice per month were hauled into and out of the shed before
referred to.  In the meantime, it was passed through the ice
crusher.  There were times when the alley was so congested
that cans and bottles of milk were unloaded upon the sidewalk
on University Avenue.  This tended to the increase of the
disturbance of persons on the north side of that street.  Where
so many teams are brought to a stop at the same place every
day, it is easily credible that a condition of nuisance would
arise as a result of the manure and urine of the horses.  This
is especially so as to the alley.  To a lesser degree, the same

thing would be true of University Avenue, whenever it was used for unloading purposes. Some complaint is made by plaintiffs as to the condition of the avenue, created by the conduct of farmers who unhitched and fed their teams upon the avenue in front of the plaintiffs' residences. These farmers were patrons of the defendant company, in that they sold and delivered milk to it daily. We think the defendant was not chargeable with the conduct of these persons. They alone were chargeable with such misconduct. Such use of the street could be easily prevented by appropriate warning and prosecution, and we take little account of it for the purposes of this case. We find, therefore, that, in the respects herein indicated, the charge of nuisance was sustained.

Whether the defendant can eliminate these conditions and still operate its plant is a question upon which we cannot speculate. We deem it just, however, that the door should be open to a bona fide attempt in that direction, if the defendant is so advised. For this reason, we have aimed to be specific in our foregoing consideration. It may be that the defendant could so inclose its ice crusher and muffle its steam exhaust as to eliminate the unreasonableness of the noise therefrom. It may be, also, that it can extend its buildings to the east so as to include and inclose the blind alley on the east and to make its driveways and loading platforms wholly within doors. Whether this would be effective, as an avoidance of the nuisance, we can form no advance opinion. This would undoubtedly require greater efforts to maintain satisfactory sanitation, but the situation is at best a difficult one. Reasonable opportunity will be given the defendant to make such reasonable changes as it may desire with a view of obviating the conditions which are here found. If the defendant shall choose to make changes, the final test of compliance must be not what it shall have done, but what the resulting condition shall then be. No resulting condition can

3. NUISANCE: operation of plant: opportunity of owner to abate.

be tolerated which unreasonably disturbs the sleep of the neighborhood in the night hours.

In the respects indicated, the decree entered below will be modified, and otherwise affirmed. The case will be remanded to the district court.—*Modified* and *Affirmed.*

DEEMER, C. J., LADD and PRESTON, JJ., concur.

### SUPPLEMENTAL OPINION ON REHEARING.

EVANS, J.—Upon rehearing, it is made to appear to us that, since the original submission, the defendant dairy company has purchased the Jaderstrom property, lying west of the blind alley referred to in the opinion. This fact amounts to a dismissal of the case, so far as plaintiff Jaderstrom is concerned. Of the plaintiffs before us in the final submission, he appeared to have sustained the greatest private injury. By reason of this purchase, the Dairy Company now owns on both sides of this blind alley, which extends from University Avenue only to the south line of the Jaderstrom and Dairy Company properties. What is said, therefore, in the original opinion will no longer be deemed to apply to the private grievances of Jaderstrom, and the final decree will be modified accordingly.

With the modification here indicated, the original opinion will stand.—*Modified* and *Affirmed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.