KOBIELSKI v. BELLE ISLE EAST SIDE CREAMERY CO.

NUISANCE—CREAMERY PLANT IN RESIDENTIAL SECTION—NOISES AT NIGHT.

In a suit by the owners of a two-family flat to abate a nuisance claimed to be created by defendant by operating its creamery plant in a residential section of a city at night in such a way that the noises keep plaintiffs and

On question of noise incident to lawful industrial business as an element of nuisance, see notes in 17 L. R. A. (N. S.) 287; 44 L. R. A. (N. S.) 236; 23 A. L. R. 1407.

their tenants awake, and by reason thereof plaintiffs are unable to keep tenants in their other flat, evidence *held,* sufficient to entitle plaintiffs to a decree. FELLOWS, CLARK, and MOORE, JJ., dissenting.

Appeal from Wayne; Mandell (Henry A.), J. Submitted January 2, 1923. (Docket No. 9.) Decided April 27, 1923.

Bill by Stanley Kobielski and another against the Belle Isle East Side Creamery Company to abate a nuisance. From a decree dismissing the bill, plaintiffs appeal. Reversed, and decree entered for plaintiffs.

*Walter M. Nelson,* for plaintiffs.

*Edward D. Devine,* for defendant.

BIRD, J. Plaintiffs filed their bill in the Wayne circuit court to abate a nuisance alleged to have been created by the defendant in the vicinity of their dwelling. Relief was denied and the bill dismissed. Plaintiffs appeal. Plaintiffs were the owners of a two-family flat known as 1030 Forrest avenue, east, in the city of Detroit. They occupied one of the flats and rented the other one. To the west of plaintiffs' lot is a public alley 25 feet in width and west of the public alley are the lots occupied by defendant as a creamery plant. When plaintiffs purchased their property there there was one residence immediately west of the alley, but those premises were purchased by defendant and the house moved therefrom. Now defendant's premises bound the alley on the west, and plaintiffs' premises are on the east, their house being situate within 2 feet of the alley. About a year after plaintiffs purchased their premises defendant bought some lots on that block and established its creamery. Since that time defendant's plant has gradually expanded and absorbed other lots.

222—Mich.—42.

Defendant has a capital of $750,000 and does a large business.    It has 75 routes over which it delivers milk.    It delivers milk to 20 independent dealers for their routes.    It employs a large number of men, operates between 90 and 100 vehicles, some of which are automobiles and some are wagons.    It uses in its business a large number of milk cans, bottles and cases.    It turns out about 2,500 cases of milk every morning.    It maintains in the plant a conveyor which conveys the milk from the plant to the loading platform.    To the south of the plant and plaintiffs' premises it maintains the barns for its horses.

The testimony shows that the active work with trucks and wagons commences about 12:30 at night and increases in activity up to 2:30 or 3 o'clock a. m., when the maximum is reached, and then continues on until between 7 and 8 in the morning.    Heavily loaded auto trucks come in over the paved alley and unload and then reload with empty cans.    Horses and wagons to carry the milk over the 75 routes are gotten ready around 3 o'clock in the morning and they load up their milk and drive out over this paved alley within 2 feet of plaintiffs' house.    The milk cans are thrown against each other and the clinking of bottles is heard when the men are loading up or returning the bottles.    In addition to this activity the men are talking to each other in a loud voice in order to be heard.    Some of them swear at their restless horses.    Automobiles are started and stopped and some of them are left running during the process of loading, and the smoke and bad odor work their way into plaintiffs' house in the warm weather when the windows are up.

The plaintiffs allege that this intense activity keeps them awake at night; that they are frequently awakened by this medley of noises and are afterwards unable to sleep again by reason of them.    That the

deprivation of sleep has had an unfavorable effect on their health and produced nervous disorders to such an extent that plaintiff lost his position by reason of it.

Plaintiffs further complain that by reason of the noise they are unable to rent the other flat in their house; that their tenants would remain only for a short time because they could not sleep. This claim was verified by several ex-tenants appearing as witnesses and testifying to the fact. Several other witnesses, some of them neighbors, testified to the boisterous manner in which the work of the plant is carried on. Other witnesses appeared for defendant and gave testimony modifying to some extent that given for plaintiffs.

At the conclusion of the proof the chancellor announced the following conclusion:

"*The Court:* I will find as a fact, and as a matter of record, that the conditions as shown by the evidence to have existed do constitute a nuisance, and I do think this should be so changed and modified by a decree as to abate in a degree the nuisance that now exists."

The chancellor concluded, however, to give defendant an opportunity to better conditions, and suggested that a shed be built over the paved alleyway between plaintiffs' house and the creamery. The case was adjourned and this suggestion was acted upon. A shed was built, and further proof was then taken as to its efficiency. At the conclusion of the adjourned hearing the chancellor denied the relief prayed for and dismissed plaintiffs' bill.

The question presented is whether these disagreeable noises in the night time in such close proximity to plaintiffs' dwelling constitute a nuisance which should be abated by injunction. In considering the question whether noises furnish a ground for injunctive relief it is observed in R. C. L. that:

"The authorities are numerous which hold that noise alone, or noise accompanied by vibration, if it be of such character as to be productive of actual physical discomfort and annoyance to a person of ordinary sensibility, may create a nuisance, and be the subject of an action at law, or an injunction from a court of equity, though such noise and vibration may result from the carrying on of a trade or business in a town or city. To have this effect the noise must be unreasonable in degree; and reasonableness in this respect is a question of fact depending on the character of the business, the manner in which it is conducted, its location and relation to other property, and the other facts and circumstances of the case. The number of people concerned by the noise and the magnitude of the industry complained of are both elements entitled to consideration in reaching a conclusion as to the fact. And, again, the time at which noises are made is an element to be considered in determining whether a noise constitutes an actionable nuisance. A noise incident to the operation of machinery during the day may not be a nuisance, while the same noise during the usual sleeping hours of the night would constitute a nuisance. And noises made on Sunday may constitute a nuisance though they would not have been such if made on a weekday." 20 R. C. L. p. 445.

In the case of *Reilley* v. *Curley*, 75 N. J. Eq. 57 (71 Atl. 700, 138 Am. St. Rep. 510), it is said:

"The next question is whether noise alone may constitute such a nuisance as to subject the one creating the same to restraint in equity. That such is the case I am convinced from the authorities, not only in our State, but in many other jurisdictions.

"Of course, the character and volume of the noise, and the time and duration of its occurrence, and the place where it occurs, and the surroundings thereof, are the important and determinative features. *Davidson* v. *Isham*, 9 N. J. Eq. 186; *Wolcott* v. *Melick*, 11 N. J. Eq. 204 (66 Am. Dec. 790); *Ross* v. *Butler*, 19 N. J. Eq. 294 (97 Am. Dec. 654); *Cleveland* v. *Gaslight Co.*, 20 N. J. Eq. 201; *Demarest* v. *Hardham*, 34 N. J. Eq. 469; *Cronin* v. *Bloemecke*, 58 N. J. Eq.

313 (43 Atl. 605); *Gilbough* v. *Amusement Co.*, 64
N. J. Eq. 27 (53 Atl. 289); *Laird* v. *Sanitary Co.*,
73 N. J. Eq. 49 (67 Atl. 387); *First M. E. Church*
v. *Grain & Coal Co.*, 73 N. J. Eq. 257 (67 Atl. 613);
*Powell* v. *Furniture Co.*, 34 W. Va. 804 (12 S. E.
1085, 12 L. R. A. 53, with numerous cases in the
notes); *Hill* v. *Fertilizer Co.*, 112 Ga. 788 (38 S. E.
42, 52 L. R. A. 398); *Froelicher* v. *Oswald Iron-
works*, 111 La. 705 (35 South. 821, 64 L. R. A. 228);
*Herring* v. *Wilton*, 106 Va. 171 (55 S. E. 546, 7 L.
R. A. [N. S.] 349, 10 Ann. Cas. 66, 117 Am. St. Rep.
997); 2 Wood on Nuisances (3d Ed.), § 611."

In 1 Spelling on Injunctions (2d Ed.), § 431, it is
said:

"Noises which tend to disturb rest and quiet in the
neighborhood may be restrained. * * * To war-
rant an injunction against a noise as a nuisance it
must be shown that the noise is such as to produce
actual physical discomfort to a person of ordinary
sensibilities, and is unreasonably and unnecessarily
made."

In the case of *Herring* v. *Wilton, supra,* the plain-
tiff filed suit to restrain defendant from keeping a
kennel of dogs 125 feet from his premises on account
of the whining of the puppies and the barking of the
dogs at night. The claim was that the whining and
barking kept plaintiff's family awake at night, and
deprived them of their rest. After a hearing the
noises were declared to be a nuisance and a decree was
made abating them.

The case of *Mitchell* v. *Flynn Dairy Co.*, 172 Iowa,
582 (151 N. W. 434, 154 N. W. 878), the relative
positions of the dwelling and creamery were the same
as here. The noises complained of were similar, the
time of night when the noises were made was the
same, and the controlling questions are the same. It
was said, in part:

"We have already set forth the general nature of the noises complained of in the petition. This branch of the case discloses just grounds of complaint by plaintiffs. In considering this question, two prominent facts of great aggravation stand forth. One is the night operation of the plant, and the other is the use of the west alley by the defendant. This alley was paved. It was a public alley, but it was practically appropriated by the defendant to its private use, and thereby made a part of its private plant. The alley extended originally to the south line of plaintiff's lots. The defendant, however, built a shed across the south end thereof. The alley was so connected with the building as to make a continuous drive from the north end of the alley south, then east into the buildings, then north along an inside driveway. Bottles of milk and cream were loaded or unloaded from the wagons standing in this alley. This work began at 1:30 in the morning, and continued at short intervals into the forenoon. The teams thus standing were within a few feet of the sleeping rooms in the residence of Jaderstrom. Profane (and sometimes obscene) teamsters did their part to disturb all nearby sleepers. It is needless to argue that such a situation would utterly destroy all opportunity for rest in such adjacent dwelling. On the east side was the other unloading platform, and similar noises there disturbed the rest of the Mitchells, 100 feet away. In addition to this, at various hours of the night and day, was the steam exhaust and the operation of the ice crusher. Seven or eight hundred thousand pounds of ice per month were hauled into and out of the shed before referred to. In the meantime, it was passed through the ice crusher. There were times when the alley was so congested that cans and bottles of milk were unloaded upon the sidewalk on University avenue. This tended to the increase of the disturbance of persons on the north side of that street. Where so many teams are brought to a stop at the same place every day, it is easily credible that a condition of nuisance would arise as a result of the manure and urine of the horses. This is especially so as to the alley. To a lesser degree, the same thing

would be true of University avenue, whenever it was used for unloading purposes."

And the court found the charge of nuisance sustained and ordered an abatement of them.

See, also, note to *Powell* v. *Furniture Co., supra; Stevens* v. *Rockport Granite Co.*, 216 Mass. 486 (104 N. E. 371, Ann. Cas. 1915B, 1054, and note).

Te are persuaded that the first impression of the chancellor in the present case was the correct one. The subsequent testimony as to the efficiency of the shed does not convince us that the noises have been abated or modified to any extent by reason of the structure. A statement of the relative positions of plaintiffs' house and defendant's creamery, supplemented with defendant's recital of the activities of the plant during the night, is sufficient to establish the fact that it is a nuisance as to plaintiffs and their tenants. It would be well nigh impossible to have 90 vehicles consisting of automobiles, trucks, horses and wagons with their attendant noises moving about on a stone pavement, soon after midnight, within 2 feet of one's house without creating a disturbance which would affect the slumbers of normal people. We think the proofs, which are not disputed, establish the fact that these noises have affected the peace and health of plaintiffs and deprived them of several tenants. Defendant is conducting a large and important industry and has a large investment in its plant, but these facts do not authorize it to establish its plant in a residential section of the city and so operate it at night as to deprive those living in close proximity of a reasonable and normal use of their property. Whether defendant can change its operation in a way to avoid this nuisance is for the company to solve. Reasonable time should be granted it to accomplish it if it can, but, in any event, the nuisance must be abated within a reasonable time.

The decree is reversed, and one must be entered in conformity to this opinion.

WIEST, C. J., and MCDONALD, SHARPE, and STEERE, JJ., concurred with BIRD, J.

MOORE, J. For the reasons stated by the chancellor, I think the decree should be affirmed, with costs to the appellee.

FELLOWS and CLARK, JJ., concurred with MOORE, J.