C. V. MARTIN, *et al.*

v.

ANDREW C. WILLIAMS, *et al*

( No. 10758)

Submitted January 24, 1956.    Decided March 13, 1956.

596

HAYMOND AND RILEY, JUDGES, dissenting.

*Sidney J. Kwass, Edmund C. Stone, Jr., M. E. Boiarsky,* for appellants.

*Joseph M. Sanders, Arthur F. Kingdon,* for appellees.

BROWNING, PRESIDENT:

This is an appeal from a decree of the Circuit Court of Mercer County perpetually enjoining the defendants Williams and Othling from "conducting, operating and maintaining at its present location the used car sale business described in the pleadings and the evidence; and it is further adjudged, ordered and decreed that said defendants shall, within thirty days from the date of entering the decree, remove from said tract or parcel of land all automobiles, trucks, light poles, wires, lights, equipment, installations and structures used by them in the conduct of the used car sales business."

The property of the defendants consists of an 11.75 acre tract fronting 312.6 along the south line of a portion of U. S. Routes 21 and 52, known locally as the Cumberland Road. The northern line of the Cumberland Road is also the southern corporate limit of the City of Bluefield. The plaintiffs Martin and Lilly reside on the northern side of the road, within the corporate limits, and in an area zoned by the City of Bluefield as residential, Martin directly opposite a portion of the frontage of the defendants, and Lilly the second lot to the east of Martin. The plaintiffs Doak, Moyer and Richardson live on the southern side of the road, Doak adjoining the land of defendants to the west, and Moyer adjoining the land of defendants to the east. Richardson adjoins Moyer to the east. All land lying on the southern side of the road is without the corporate limits of

Bluefield, and, of course, not zoned for any purpose, and no restrictions are contained in the deeds thereto. The plaintiff Richardson built his home in 1923, and, at the present time, has "considerably more than $50,000.00." invested in it; Doak, in 1946-47, more than $40,000.00; Lilly, 1948, Martin, 1949, $18,500.00; and Moyer, 1950-51, $48,400.00.

Prior to 1953, there were no businesses located along the south side of the road from the intersection of Cumberland Road with Bland Road, to the east, to the intersection with Jefferson Drive to the west, a distance of approximately 1,000 feet and the area in which the plaintiffs and defendants have their properties. However, there was a small grocery store just to the east of Bland Road, and farther on, approximately a mile, a motel. To the west there was a group of business establishments at the intersection of Cumberland Road and Washington Street, approximately 300 feet west of Jefferson Drive. Farther west are located several farms which, from aerial photographs, have fine homes and well tended acreages. Due to the topography, none of the business establishments in either direction were visible from the properties of the plaintiffs, with perhaps the exception of Doak. Cumberland Road is heavily travelled, approximately 3,000 vehicles a day, and there is evidence that other business establishments and a new high school are contemplated along the southern side of the road within a mile on either side of the plaintiffs.

Defendant Williams, after a long search for a suitable site on which to expand his automobile business, acquired his land from one Matz in 1953. Matz had acquired the land from one Peters, who had offered to sell to some of the plaintiffs. Matz, prior to Moyer's building his home, had conveyed to him the information, directly or indirectly, that he had acquired the land for business purposes, having in mind a motel, and offered to either sell that land or buy Moyer's land, which offer was declined.

After acquiring the land from Matz, defendants proceeded to install a "used car lot" on the front portion of the property. A small office was built, painted a vivid yellow and vermillion, three parallel strings, of approximately 100 bulbs each, of electric lights were suspended at a height of approximately 15 feet, a canopy sufficient for one automobile to be placed thereunder, and an advertising banner and streamers were placed on the lot. As described by one witness, it was a "typical, well-kept used car lot", and, by another, that it had a "garish, carnival atmosphere." The lot was open from 8:30 A. M. to 8:30 P. M., Monday through Saturday, and from 12:30 until 8:30 P. M. on Sunday. The 8:30 closing hours fluctuated with the presence or absence of customers on the lot.

Plaintiffs testified that the strings of lights, which were kept on until approximately 9:00 P. M., after which one half of the back row of lights were kept burning, lighted up their yards and porches, and in some instances the inside of their dwellings, including the bedrooms, and greatly interfered with, if not destroying, their use and enjoyment of their properties; that the noises, incident to raising and lowering of automobile hoods, testing of brakes, voices of customers and employees (in two instances profanity); the unsightliness of some of the merchandise; the attendant incidents of such a business depreciated the values of the properties some 50% in most instances, and slightly less in regard to the Doak and Lilly properties; and constitutes a nuisance. The plaintiffs, while varying as to resentment of various types of business which might be established on the lot, concur in their abhorrence of the used car business, and, generally, would resent the properties' use for anything other than residential purposes.

Defendants, during the pendency of the suit, installed hooded flood lights for the purpose of all night lighting, which lights are directed down into the lot, and cast no

light on plaintiffs' properties. However, since there is no testimony that the string lights were removed, it may be presumed that they are still burned until approximately 9:00 P. M. Defendants also minimize any noise that results from the conduct of the business, and state that it is small in comparison to the noise normally arising from the highway in front of plaintiffs' properties. Defendant Williams maintained a table showing the number of people visiting the lot during a twenty day test period which shows that the maximum number of people in one day was 65, the minimum, 11; the daily average, 30, and the hourly average 11. He further stated that the present use as a used car lot is temporary, that he contemplates erecting a modern new car showroom and office with service building, and, perhaps erecting a shopping center in the central part of the property. Testimony was offered in his behalf that this area was an excellent business location, and, as heretofore mentioned, other businesses have acquired or are attempting to acquire property along the southern edge of Cumberland Road.

The court found that the used car business in this area constitutes a nuisance, and granted the injunction above quoted. The operation of a used car lot is a lawful business, and, as a general rule, it cannot be a nuisance per se. However, from the circumstances surrounding its location and operation, it may become a nuisance per accidens or a nuisance in fact. The threshold question for determination then is whether the trial chancellor was justified from this record in holding that the defendants' used car lot was placed in an exclusive residential area. Much of the hundreds of pages of testimony taken, and many of the scores of exhibits and photographs introduced as evidence, are directed to that question. The distances estimated in the testimony and the contentions with regard thereto in briefs of counsel do not clearly show the proximity of certain business establishments situated on the south side of Cumberland Road, and their proximity to the area in question.

Defendants' Exhibit No. 1, prepared by Elmer C. Barton, Civil Engineer, on February 3, 1954, showing the entire City of Bluefield, and the location of the residences, business establishments and vacant areas south of Cumberland Road, is revealing. Beginning at a point approximately one mile east of the used car lot, there is a motel, and between the motel and the used car lot, there is only one business establishment, that being a one story brick building, the Henderson Grocery Store, which is approximately 600 feet east of the nearest residence of the plaintiffs. Continuing along Cumberland Road toward the west beyond the used car lot, the next business establishment is a two story asbestos shingle building operated as a grocery store by a man named Burton. That store is approximately 350 feet west of the nearest residence of plaintiffs. The Burton Grocery Store and a gasoline service station are on or near the southeast corner of Cumberland Road and Bland Road. Route 52 turns south at this point along Bland Road, and in close proximity to Cumberland Road there are several business establishments, such as a plumbing company, an electrical shop, a laboratory, an apartment building and a cinder block building in which is operated "Slaughter's Garage". As heretofore stated, because of the topography of the area, none of these establishments can be seen from the residences of any of the plaintiffs, with the possible exception of the Doak property, and noises emanating therefrom cannot be heard by any of the plaintiffs where they reside. Continuing west on Cumberland Road, there is located on the Calfee estate, approximately one mile west of the used car lot, an establishment described as a "Drive-In Restaurant", known as the "Beacon", and a short distance west of the Beacon, there is a substation of the Appalachian Electric Power Company. There are no other business or commercial establishments between the substation and the West Virginia-Virginia State line, which constitutes the western limits of the City of Bluefield. Beginning a few hundred feet west of the Bland Road - Washington Street intersection, and continuing east to the motel,

there are thirty-one residences, and many vacant lots or tracts of land south of Cumberland Road. The trial chancellor confined his holding to the area between the intersection of Bland Road with Cumberland Road and the Jefferson Drive-Cumberland Road intersection, a distance of approximately 1,250 feet, in which lies the used car lot and the residences of the plaintiffs, as well as other residences both on the north and the south sides of Cumberland Road. There was sufficient evidence before the trial chancellor to justify his finding that the defendants placed their used car lot in an exclusive residential district.

The plaintiffs alleged in their bill, and by their evidence attempted to prove, that the manner of operation of the used car lot was such as to constitute a nuisance because of the effect of the lights, noises, unsightliness of the lot, and the resulting diminution in value of their properties. Since the determination of the questions presented depends upon the facts, it becomes necessary to relate some of the evidence.

Plaintiff Richardson stated that: "* * * -- so we have been driven off our west porch. In.the front yard there is nothing between us and this used car lot, and the high illumination from all of those lights is so strong that you can read a newspaper in my front yard, and certainly that destroys any sense of privacy that might exist about a home and is an unwelcome intrusion." He testified further that the lights did not bother his family inside their home, but that the brilliance of the lights was such that it was a strain on a person's eyes to face them. He said: "To be sure — you wouldn't sit and face them." He further testified as to the reduction in value of his property as a result of the establishment of the lot.

The plaintiff M. R. Moyer stated: "* * * the whole thing, as a matter of fact, is just about as hideous in my opinion, as any one would care to look upon." The witness further described the "unsightly truck bodies" upon the lot near his premises, and, with reference to

the lights, stated: "Now, in our home the lights flood our living room; they flood our library to the extent that it's necessary that we keep our draperies in that room drawn. They flood our dining room, and, to a degree, our kitchen. From the rear of the home the sleeping area and the entire back part of the mountain is just almost as light as day. * * *" He stated that after nine o'clock P. M., there was usually only one strand of lights burning during the remainder of the night, but that there had been two recent exceptions when there was "great business going on in the business hut, and they were on until after 10:00 o'clock all over the lot." He further stated that there was "* * * a constant racing of cars around there, on a gravel terrain, and anyone with any experience certainly can comprehend what that does to one's surroundings." His testimony was to the effect that business was conducted on the lot on Sundays beginning at approximately 12:00 o'clock noon.

Goldie Moyer, one of the plaintiffs and the wife of M. R. Moyer, testified as to the lights as follows: "Well, in the first place, it has ruined the privacy of my living room. It has ruined the privacy of my front yard. It has ruined the privacy of my side porch. It has ruined the privacy of my terrace, and it has almost ruined the privacy of my bedroom. We can't draw the curtains because we have to have a little air at night, & the whole back yard is flooded with light from the bright lights, his back lights. He leaves them on, of course, all the time — all night long." "* * * As I said, it has ruined the privacy of the whole house unless I go to the bathroom and close the door and pull the shades down." She further described the noise from the lot by men talking in a loud tone of voice, "racing of motors — they do that a lot, and it's terrible — and lifting up hoods and slamming them down." She stated, in answer to the question as to how the enjoyment of her home had been affected, that: "It has ruined it." When asked if she was a woman of normal sensibilities, Mrs. Moyer stated:

"I certainly am. I taught school for twenty years, and I feel if you teach school that long, you're pretty normal."

Lillian Lilly, wife of Robert C. Lilly, whose residence is directly across the road from the Moyer residence, stated that the operation of the lot interfered with the "comfort and enjoyment" of their residence, and further stated: "You don't like to get out in your yard with all that racket and the bright lights." She was asked if the lights affected "the eyes in any way", and stated: "Well, there is some glare." She further testified that the lot was a very busy place on Sunday, and that it was kept open for business on Sunday evening until "About eight or nine."

Carl V. Martin, another plaintiff, testified that: "One of the main features besides the lights is that people come there, sometimes children and sometimes not, and throw paper cups and napkins into our yard, and it necessitates a continuous picking up." He stated that: "We only have one bedroom that the light shines in. That's on the west side. But our porch—you don't like to sit out there. It's bright as daylight." With reference to the noise, he stated: "Well, opening and closing car doors and slamming down the hoods and pulling in there and putting on the brakes and sliding on the gravel. Lots of times there's loud talking." He was further asked about "the sign and the canopy and the little hut", and stated: "* * * It has a carnival appearance, pretty gaudy colors; then at night when the wind blows those lights, they move, and you catch your head going this way and that way. We keep our blinds closed and our front door closed on account of them." This witness, whose residence is within the corporate limits of the City of Blue-field, stated that since 1948 there had been ten or twelve residences erected within three or four hundred feet of his property.

Eva Martin, another plaintiff, whose residence is directly across the road from the lot, stated: "Well, I think it's objectionable in every way. You can't lie

down to take a little nap. Now, I had been sick for a good, long while, and Sunday afternoon I thought I'd sleep a little. The cars were pulling in and out there the whole time, brakes being put on, hoods raising and lowering — you couldn't rest for the noise. I think Sunday was about one of the worst days I have ever seen there." She stated that: "* * * we pick up trash constantly. * * * ", which is blown from the lot into her yard. She also testified that: "* * * I have seen cars up there where it would be congested, and the cars couldn't get by, and they have turned around through our circular driveway — right in my driveway — came in this way and went out that way." With reference to the lights, she stated: "* * * Now, our front door has four little panes about like this (indicating). I take a towel each night and put adhesive tape on each corner and cover that. I have to, because I couldn't even sleep with the glare in there. I have a mirror that that light reflects right on — that light." She also stated that: "* * * We can't sit on our porch any more." Prior to the establishment of the used car business, the witness stated that there was no business establishment within view of her home.

The plaintiff C. W. Doak did not testify, he being in bad health and away from the City of Bluefield at the time depositions were taken, but his son, Earl Doak, stated that his father's property was adversely affected by the lights. He testified that: "All of Mr. Doak's bedrooms are on that side where the lights are on, and they shine in those windows. Mr. Cousins has put up draw drapes, and they always had venetian there before."

Several witnesses who were engaged in the real estate business in the City of Bluefield, and others qualified as appraisers of real property values in that area, testified as to the substantial reduction in the value of the plaintiffs' properties, as a result of the establishment of the used car lot in close proximity thereto. J. S. Hall, who stated that he had been in the real estate business in

the City of Bluefield for approximately fifty years, testified as to the area lying between Jefferson Street and Jefferson Drive on the west, and Bland Road where it intersects with Cumberland Road on the east, prior to the establishment of the used car lot, that: "* * * it was a high-class neighborhood, and until this sales lot was opened out there, it was exclusively residential." He further stated that it was "desirable for residential purposes."

As heretofore stated, the defendants no longer kept the rear strand of lights burning after business hours, approximately 9 P. M., but it is not clear whether that precaution was taken before or after the testimony of the plaintiffs had been introduced. Thereafter, hooded flood lights were installed for the purpose of night lighting after closing hours.

The Legislature has given authority to cities and towns of this State to establish residential areas by zoning ordinances, but it has not adopted legislation in this regard in unincorporated areas, although some states have done so. Since there is no legislation to the contrary, the common law remains in effect. It has long been established that courts of equity may, in a proper case, abate a private nuisance. Mandatory injunctions are awarded for the abatement of nuisances more frequently than for other purposes. *Lyons* v. *Viglianco,* 122 W. Va. 257, 8 S. E. 2d. 801.

Although this Court has considered the question of private nuisances upon many occasions, and the cases elsewhere are innumerable, we find few in which the sole question at issue was the casting of lights upon another person's premises. In *The Shelburne, Inc.* v. *Crossan Corporation,* 95 N. J. Eq. 188, 122 A. 749, an injunction was issued prohibiting the use after midnight of an electric sign which cast light on plaintiff's hotel in such a manner that the light shone directly into the bedrooms of the hotel, thereby lowering their value as such. No other factor but light was involved in that case.

There are numerous nuisance cases where artificial light was cast upon the premises of another, by the operation of gasoline service stations, playgrounds, circuses, athletic events, et cetera, but it is not clear from many of the decisions whether relief was granted upon that ground alone, or whether other elements of nuisance contributed to the final adjudication of the case. 5 A.L.R. 2d 705, under the annotation "Casting of light on another's premises as constituting actionable wrong."; 39 Am. Jur., Nuisances, P. 323, et seq.; 66 C. J. S., Nuisances, §8; Words and Phrases, Permanent Edition, 28A, Nuisance Per Accidens, Page 744.

In *Snyder et al.* v. *Cabell, et al.*, 29 W. Va. 48, 1 S. E. 241, occupants of dwelling houses sought to enjoin the defendants from operating a skating rink situate near the residences of plaintiffs. The trial court dismissed the bill, but this Court reinstated the original temporary injunction, and made it perpetual. The Court, in the opinion, said: "* * * We base the propriety of the injunction on the noise alone." The 5th syllabus point reads as follows: "Where the prosecution of a business in itself lawful in the neighborhood of a dwelling-house renders the occupation of it materially uncomfortable by noises alone, the carrying on of such business, while it produces such results, will be restrained by a court of equity."

In *Powell* v. *Bentley & Gerwig Furniture Co.*, 34 W. Va. 804, 12 S. E. 1085, plaintiff sought to enjoin defendants from the operation of a furniture factory on the ground that it was a nuisance to the plaintiff in the use and enjoyment of his nearby lot and dwelling house. Plaintiff subsequently instituted an action of trespass on the case for damages, which action at law was pending in the same court when the decree enjoining the operation of the factory was pronounced. The Court said: "On the question of nuisance, the evidence is conflicting; at any rate the plaintiff does not put his case high and dry, above all ground of fair questioning. There is enough perhaps for the chancellor to have directed an

issue. But this issue the plaintiff by his suit at law has already brought on and made up. Under such a conflict of evidence, the suit at law should have been tried first. * * *" The factory had been erected at a cost of $30,-000.00, and employed more than sixty people. This Court also found that the plaintiff and his witnesses "seem to be, by reason of ill health or by nature, rather supersensitive to such things."

In *Ritz, et al.,* v. *The Woman's Club of Charleston,* 114 W. Va. 675, 173 S. E. 564, this Court affirmed a decree of the Circuit Court of Kanawha County finding that dances conducted at the clubhouse of the defendant, in a residential district of the City of Charleston, were a nuisance, and enjoining their continuation after nine o'clock at night. The first syllabus point states: "Noise alone may create a nuisance, depending on time, locality and degree."

The cases from other jurisdictions upon this phase of the issue are so numerous that it would serve no good purpose to attempt to discuss them in detail. Suffice to say that, like all of the other cases involving injunctive relief against nuisances, each was decided upon its particular facts, and the facts of no two such cases are identical. 14 M. J., Nuisances, §8; 39 Am. Jur., Nuisances, P. 323, et seq., 66 C.J.S., Nuisances, P. 781, et seq.; Words and Phrases, Permanent Edition, 28A, Page 669.

In considering the aesthetic aspects of this cause, we have given careful consideration to three decisions of this Court. In *Fruth, et al., Trustees, Etc.* v. *Board of Affairs,* 75 W. Va. 456, 84 S. E. 105, the 3rd. syllabus point reads as follows: "An ordinance of a municipal corporation ordained pursuant to a provision of its charter authorizing it, establishing a building line on a certain street, and inhibiting abutting owners from encroaching thereon, based on merely aesthetic considerations, is not within the police power, and is unenforceable as a police regulation." In *State ex rel. Nunley* v. *Mayor and City Council of the City of Montgomery,* 94

W. Va. 189, 117 S. E. 888, a peremptory writ of mandamus was awarded directing the City of Montgomery to grant a permit to Nunley to build a public garage in a residential district of the city. Although the decision was based upon the inaccuracy of the ordinance, in that it did not fully prescribe for the regulation of such buildings, and definitely set forth the area in which they could not be constructed, the respondents contention that the garage would be unsightly, obnoxious and objectionable to the residents of the block, was discussed briefly. The latest decision of this Court upon the question is *Parkersburg Builders Material Company, et al.*, v. *Barrack*, 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291. Upon the suit of the owners of property in the vicinity of a lot used by the defendant for the outdoor storage and wrecking of abandoned automobiles, the Circuit Court of Wood County entered a decree abating the alleged nuisance. The decree was reversed by this Court, the injunction dissolved, and the bill dismissed upon the ground that the section of the City of Parkersburg, wherein the defendant's wrecking lot was situated, was "not a clearly established residential community." The only syllabus point states: "Where a section of a city is not a clearly established residential community, equity will not be warranted in excluding therefrom as a nuisance an automobile wrecking business merely on the ground of unsightliness." While it may be considered obiter dictum because of the holding that the defendant's business was not in a clearly established residential community, Judge Maxwell, speaking for the Court, used language which creates a strong implication that the decision would have been to the contrary had the wrecking business been established in an exclusive residential area. It was said in the opinion that: "Happily, the day has arrived when persons may entertain appreciation of the aesthetic and be heard in equity in vindication of their love of the beautiful, without becoming objects of opprobrium. Basically, this is because a thing visually offensive may seriously affect the residents of a community in the reasonable enjoyment of their homes, and

may produce a decided reduction in property values. Courts must not be indifferent to the truth that within essential limitations aesthetics has a proper place in the community affairs of modern society." "Of course, equity should not be aroused to action merely on the basis of the fastidiousness of taste of complainants. Equity should act only where there is presented a situation which is offensive to the view of average persons of the community. And, even where there is a situation which the average person would deem offensive to the sight, such fact alone will not justify interference by a court of equity. The surroundings must be considered. Unsightly things are not to be banned solely on that account. Many of them are necessary in carrying on the proper activities of organized society. But such things should be properly placed, and not so located as to be unduly offensive to neighbors or to the public. * * *" Judge Maxwell quoted at some length from the opinion of the Supreme Court of the United States in *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 47 S. Ct. 114, a part of which states: "* * * A nuisance may be merely a right thing in the wrong place, — like a pig in the parlor instead of the barnyard. * * *" He further stated that: "An automobile junk yard is not necessarily an objectionable place. The business of buying old automobiles, wrecking them and selling serviceable parts as such and junking the residue is an honorable and useful business. But an outdoor lay-out of a business of that kind necessarily is not pleasing to the view. Such business, therefore, should not be located in a community of unquestioned residential character." Judge Kenna, in a concurring opinion, took sharp issue with the language of the Court upon the discussion of the aesthetic phase of the case. He contended that it was not only obiter dictum, but in conflict with the decision of this Court in *Fruth, et al., Trustees, Etc.* v. *Board of Affairs, supra.*

Upon the question of reduction in value of the plaintiffs' properties, as the result of the establishment of the used car lot nearby, we find this statement in Wood on

Nuisances, 3rd Edition, § 640: "Mere diminution of the value of the property, in consequence of the use to which adjoining premises are devoted, unaccompanied with other ill-results, is *damnum absque injuria.*" Also in 66 C. J. S., Nuisances, §19, P. 771, it is stated that: "However, a use of property which does not create a nuisance cannot be enjoined or a lawful structure abated merely because it renders neighboring property less valuable."

In addition to the diminution of property value, plaintiffs rely upon the casting of light upon their premises, disturbance by noises, and the destruction of the aesthetic nature of the neighborhood. The following statement in 39 Am. Jur., Nuisances, §45, we believe states the general rule: "The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance, such as might offend the taste or disturb the nerves of a fastidious or over refined person. But, on the other hand, it does not allow anyone, whatever his circumstances or conditions may be, to be driven from his home or compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim 'sic utere tuo ut alienum non laedas' expresses the well established doctrine of the law." However, this maxim, that a person should use his own property in such a manner as not to injure that of another, is of little value in a determination of the issue in this or similar cases. Again, it is a question of fact in each case as to whether the lawful use of the property by one person causes such damage to the property of another that a court of equity will take cognizance of it, and relieve the injured person by the drastic procedure of requiring the one who produces the injury to cease a lawful business.

Particular reference will be made to only a few of the many cases in the digests to which general reference has been made in this opinion. A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation un-

comfortable. *Adams* v. *Hamilton Carhartt Overall Co.*, 293 Ky. 443, 169 S. W. 2d 294. A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort. *Thornton* v. *Dow*, 60 Wash. 622, 111 P. 899. A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby. *Russell* v. *Nostrand Athletic Club*, 209 N. Y. S. 76, 212 App. Div. 543. When the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well-being, comfort, repose, and enjoyment of the ordinary normal individual residing therein, the carrying on of such business in such locality becomes a nuisance, and may be enjoined. *Jordan* v. *Nesmith*, 132 Okl. 226, 269 P. 1096. In *Kobielski* v. *Belle Isle East Side Creamery Co.*, 222 Mich. 656, 193 N. W. 214, it was held that noises made on a Sunday may constitute a nuisance, although they would not be such if made on a week day.

We have given careful consideration to a modification of this decree. That it is drastic in that it not only requires the defendants to cease the business which they are now conducting, but to remove all of the fixtures from the lot which they own, cannot be denied. However, we have determined that no modification can be made which will permit the efficient exercise of the defendants' rights to conduct this particular business at that place, and still protect the plaintiffs against the injury which must result to them therefrom. Perhaps the decree could be modified to require the defendants to close their business at sunset so that no lights would have to be burned, and that they should cease to do business on Sunday. However, the testimony, and the inferences that may be drawn from it, indicate that the defendants' business is best on week-ends, particularly on Sunday, and at night. Even such a modification would not eliminate the other elements of nuisance upon which the

decree was based. That part of the decree which requires defendants to remove their equipment from the lot cannot be harmful to them if they must cease the used car business at that place. The hut, the lights, the poles and the displays are necessary in the operation of their used car business; they can be easily transported and used at another location.

The question of whether there exists a nuisance per accidens, or a nuisance in fact, is, by its very definition, dependent upon the proof adduced before the trial chancellor. The well established rule, that the findings of a trial court will not ordinarily be disturbed upon appeal, applies to the findings of the chancellor. A finding of fact from conflicting depositions is entitled to peculiar weight, and will not be disturbed by this Court unless it is manifestly wrong. *Poling* v. *Bennett*, 103 W. Va. 456, 137 S. E. 883. In *Matney, et al.* v. *Blakely, et al.*, 97 W. Va. 291, 124 S. E. 918, the Court stated in the opinion that: "* * * The general rule is that this court will not reverse a decree rendered on conflicting depositions of such doubtful and unsatisfactory character that different judges might reach different conclusions, although the appellate court might have rendered a different decree if it had acted in the first instance. * * *" The rule was enunciated in this language in *Spurgin* v. *Spurgin*, 47 W. Va. 38, 34 S. E. 750: "It has also been well settled that in doubtful cases the decree of the circuit court will prevail, as this Court never makes a 'last guess', nor disturbs the decree of the lower court unless plainly erroneous." Upon a careful examination of the testimony, the exhibits and the law applicable to the issue presented, we are unable to say that the decree of the trial chancellor in this cause was erroneous. The decree will be affirmed.

*Affirmed.*

HAYMOND, JUDGE, dissenting:

I dissent from the decision of the majority in this suit affirming, without modification, the final decree of the circuit court which, as indicated in the majority opinion,

perpetually enjoined the defendants from operating or maintaining, at its present location, on property owned by them, an admittedly lawful business of selling used automobiles, and by mandatory injunction required the defendants, within thirty days from the entry of the decree, to remove from their land numerous designated articles of equipment, including all automobiles, trucks, light poles, wires, lights, installations and structures used in connection with the operation of that business. By that harsh and drastic action a court of equity summarily destroys a legitimate business, inflicts substantial loss upon its owners, and without affording them an opportunity to alter or adjust its operation, materially restricts and impairs the vested property right of the defendants to use and enjoy their land and the designated articles of equipment located on it. I can not subscribe to such an arbitrary and unwarranted result which, in my opinion, constitutes a manifest invasion of established property rights of the defendants and, in this instance, is neither just nor necessary.

The plaintiffs contend, in seeking injunctive relief, and the majority holds, that though the operation conducted by the defendants is a lawful business and is not a nuisance as a matter of law, its location in an exclusive residential district, the excessive number of lights and the period of their use and the noise, in connection with its operation, the unsightly appearance of certain structures and objects on the premises, and the resultant reduction in the value of the properties of the plaintiffs constitute the business, as so conducted, a nuisance in fact because of the methods employed. With that conclusion I do not agree.

It is well settled by prior decisions of this Court that a lawful business does not constitute a nuisance as a matter of law. *State ex rel. Ammerman* v. *City of Philippi,* 136 W. Va. 120, 65 S. E. 2d 713; *Parkersburg Builders Material Company* v. *Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A. L. R. 1454; *The Cen-*

*tral National Bank* v. *City of Buckhannon,* 118 W. Va. 26, 188 S. E. 661; *Chambers* v. *Cramer,* 49 W. Va. 395, 38 S. E. 691, 54 L. R. A. 545; *McGregor* v. *Camden,* 47 W. Va. 193, 34 S. E. 936. A lawful business, however, may constitute a nuisance in fact by reason of its improper location or the manner in which it is conducted. *Parkersburg Builders Material Company* v. *Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A. L. R. 1454; *Spears* v. *Goldberg,* 122 W. Va. 514, 11 S. E. 2d 532, 12 S. E. 2d 513; *Lyons* v. *Viglianco,* 122 W. Va. 257, 8 S. E. 2d 801; *McGregor* v. *Camden,* 47 W. Va. 193, 34 S. E. 936.

In *State ex rel. Ammerman* v. *City of Philippi,* 136 W. Va. 120, 65 S. E. 2d 713, this Court held that a business operated in a town for repairing, recapping or vulcanizing automobile tires is not a nuisance *per se.* This Court has also held in *The Central National Bank* v. *City of Buckhannon,* 118 W. Va. 26, 188 S. E. 661, that a gasoline filling station in a city is not a nuisance *per se,* in *Chambers* v. *Cramer,* 49 W. Va. 395, 38 S. E. 691, 54 L. R. A. 545, that a blacksmith shop or a machine shop in a town is not a nuisance *per se,* and in *McGregor* v. *Camden,* 47 W. Va. 193, 34 S. E. 936, that oil and gas wells are not nuisances *per se.*

In *Parkersburg Builders Material Company* v. *Barrack,* 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A. L. R. 1454, this Court refused to abate as a nuisance, and to enjoin its operation, an automobile wrecking business conducted on land owned by the defendant, in a section of the city of Parkersburg which contained both residences and business establishments, on which he had assembled about 125 old automobiles and on which he had erected a barbed wire fence seven or eight feet in height, and in the syllabus used this language: "Where a section of a city is not a clearly established residential community, equity will not be warranted in excluding therefrom as a nuisance an automobile wrecking business merely on the ground of unsightliness."

The grounds relied on by the plaintiffs and on which the injunctive relief awarded them is based, consisting of the noise produced, the light, and the unsightliness of the objects and the structures, used in connection with the operation of the business of the defendants, considered separately or collectively, are obviously not sufficient to support or justify the conclusion that the business of the defendants, as presently conducted, constitutes a nuisance.

Noise alone may create a nuisance; but whether noise does or does not create a nuisance depends upon the time, the locality, and the degree of the noise. *Ritz* v. *The Woman's Club of Charleston,* 114 W. Va. 675, 173 S. E. 564, 182 S. E. 92; *Snyder* v. *Cabell,* 29 W. Va. 48, 1 S. E. 241. Every noise that may occur in connection with a business, however, does not create a nuisance. To create a nuisance a noise which occurs in a residential district must be unusual and recurrent, and it must prevent sleep or disturb materially the rest and the comfort of the residents, or cause them great personal discomfort and continual annoyance. See *Ritz* v. *The Woman's Club of Charleston,* 114 W. Va. 675, 173 S. E. 564, 182 S. E. 92. The rule is that a noise which creates a nuisance must be such as materially to interfere with and impair the ordinary physical comfort of existence of ordinary people. *Powell* v. *Bentley and Gerwig Furniture Company,* 34 W. Va. 804, 12 S. E. 1085, 12 L. R. A. 53. The opinion in the *Powell* case, prepared by Judge Holt, contains these pertinent statements:

"Every man, as we have seen, has the exclusive dominion and the right to the full and exclusive enjoyment of his own property, to do with it as he pleases. His neighbor has the same right over his own property. Hence it follows as the duty of each to so use his own as not to injure that of the other, each one's duty qualifies his own right and creates a corresponding right in the other.

" * * * . But this duty must be taken with qualifica-

tions, for, in the nature of things and of society, it is not reasonable that every annoyance should constitute an injury such as the law will remedy or prevent. One may therefore make a reasonable use of his right, though it may create some annoyance or inconvenience to his neighbor."

In *State ex rel. Ammerman* v. *City of Philippi*, 136 W. Va. 120, 65 S. E. 2d 713, the opinion uses this language: "Considerable evidence is produced by respondents tending to show that residents of the vicinity wherein petitioner has heretofore operated his business were greatly annoyed by noises and obnoxious odors arising therefrom. Petitioner controverts this and a number of witnesses support his contention. We think it clear, and do not understand respondents to contend otherwise, that the business conducted by petitioner is not a nuisance *per se*. No doubt some noises and some odors obnoxious to some individuals result therefrom. This is not sufficient, however, to constitute a business a nuisance *per se*."

In *Ritz* v. *The Woman's Club of Charleston*, 114 W. Va. 675, 173 S. E. 564, 182 S. E. 92, the defendant was enjoined from conducting dances after nine o'clock at night at its club house near the homes of the plaintiffs in a residential section of Charleston. Previous to the institution of the suit and until June, 1930, fifty eight public dances, which continued far into the night, had been held at the club house. The evidence showed that those dances were patronized by a large number of persons many of whom came to them in automobiles; that all of them were very noisy; that some of them were attended with boisterous, drunken and unseemly conduct; that some of the dancers committed indecent trespasses on neighboring properties; and that the dances deprived the plaintiffs of rest and sleep and otherwise greatly annoyed them. From June until November, 1930, the defendant discontinued dances at the club house but between November, 1930, and April, 1931, when the suit was instituted, ten private

dances were held and those dances lasted each night until midnight. The evidence, however, showed that there was little, if any, improvement in the conduct of the private dances as compared to the conduct of the dancers at the previously conducted public dances; that the noises at the private dances, including the music and the sounds caused by the arrival and the departure of the dancers, their laughter and loud conversation in calling to each other, the operation of the automobiles, and the blowing of horns, were as irritating as the noises which occurred at the public dances. Upon the foregoing facts, established by the evidence, the circuit court did not prohibit all dances at the club house but enjoined the continuance of dances there after nine o'clock at night. On appeal that decree of the trial court was affirmed by this Court.

In *Snyder* v. *Cabell*, 29 W. Va. 48, 1 S. E. 241, a skating rink, located about thirty feet from the residence occupied by two of the plaintiffs in Charleston was held to be a nuisance and enjoined because of the noise produced by its operation. In that case the evidence clearly showed that the rink was operated almost every day and night except Sunday and that the noise caused by the skaters, which was loud and similar to the sound of a train of cars crossing a covered bridge, and the noise caused by the crowds of people attending the rink, by the shouts of persons in the audience, and by the sounds in connection with the skating, deprived the persons occupying two of the homes of the plaintiffs of sleep and rest, materially disturbed their comfort and the enjoyment of their homes, and required one of the plaintiffs to leave and vacate his residence.

The noise produced by the operation of the business of the defendants in this case is of an entirely different character from the noises which were shown to exist in the *Ritz* case and in the *Snyder* case and which justified the injunction awarded in each of those cases. Those noises were created by large groups of persons, some of whom engaged in extremely loud conversation and boist-

erous and disorderly conduct, and included shouting and the sounding of automobile horns late at night. No noise or conduct of that sort has occurred in connection with the business of the defendants. The only noise which it has created consisted of the ordinary conversation of persons in small groups, the average number of which was eleven during any hour of the weekday business period of from about eight thirty o'clock in the morning until about nine o'clock at night, some profanity heard on two occasions by one of the plaintiffs while he was outside of his house, the sound of unloading motor cars on one occasion, the sound of lowering the hoods of automobiles, and the sound caused by automobiles in arriving at, travelling upon, and departing from the land owned by the defendants. These noises were neither strange nor of unusual intensity. They were audible "to some extent" at the residence of one of the plaintiffs but there is no showing that they deprived the plaintiffs of sleep or materially disturbed their comfort or their enjoyment of their homes. They were of the same general character of the noises produced by the heavy daily vehicular traffic consisting of the movement of approximately 3200 automobiles which occurs during the day and at night upon one of the main public highways on which the properties of the plaintiffs and the defendants abut. The sounds caused by the conversations of persons and the operation of the automobiles on the premises of the defendants were merely the usual and ordinary sounds produced by such occurrences in a residential, a business, or an industrial community and such sounds cause only slight and trivial annoyance or inconvenience in any type of community to persons of normal sensibilities. They do not warrant restraint by injunction and they do not justify an injunction in this instance.

"No one is entitled to absolute quiet in the enjoyment of his property; he may only insist upon a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells." *Collins* v.

*Wayne Iron Works*, 227 Pa. 326, 76 A. 24, 19 Ann. Cas. 991. See also *Hannum* v. *Gruber*, 346 Pa. 417, 31 A. 2d 99. In 66 C. J. S., Nuisances, Section 22a, the text contains these statements: "Generally, noise is not ex necessitate a nuisance, even when disagreeable. It has been stated that no one is entitled to absolute quiet in the enjoyment of his property, but is limited to a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells. Thus, it has been held that as many useful acts are necessarily attended with more or less noise, reasonable noises in an appropriate locality are not necessarily nuisances, even though they are disagreeable and annoying." See also 39 Am. Jur., Nuisances, Section 47. Certainly the sounds incident to the ordinary operation of automobiles are not inconsistent with the standard of comfort which prevails in any community in which people of ordinary sensibilities reside and in which automobiles are customarily used and operated.

The foregoing comments directed to the noise of which the plaintiffs complain apply with equal force to the lights used by the defendants, the ultimate effect of which was to illuminate the lawns and the porches of the residences of the plaintiffs and to cast their rays into the living room, the library, the dining room, the kitchen, and the bath room of the residence of one of the plaintiffs, and the bed room of the residence of another plaintiff, between approximately six thirty o'clock in the evening and nine o'clock at night. The light in the living room, the library, the dining room, the kitchen, the bed room and the bath room could readily and effectively be prevented by the normal use of shades or drapes without inconvenience to the occupants of those rooms and without impairing their adequate ventilation. At most the lights, like the noise, cause only slight inconvenience and trivial annoyance which do not justify the award of injunctive relief by a court of equity. They should not and, in my judgment, they do not, materially interfere

with or impair the ordinary comfort of existence of people of ordinary sensibilities.

Unlike smoke, gases, dust and noxious odors, light is not inherently harmful and it does not unreasonably or substantially interfere with the ordinary use or enjoyment of property. See *Amphitheatres, Inc.* v. *Portland Meadows,* 184 Ore. 336, 198 P. 2d 847, 5 A. L. R. 2d 690. In that case recovery was denied the plaintiff, which operated an outdoor motion picture theatre, of damages from the defendant, which operated a race track on adjoining land, both projects being outside the limits of a nearby city, for injury to and interference with the motion pictures exhibited by the plaintiff caused by flood lights operated by the defendant at a distance of 832 feet from the motion picture screen of the plaintiff. The court held that the operation of the lights by the defendant did not constitute either an actionable trespass or a nuisance. In the opinion the court said:

"If the cases involving smoke, noxious odors, flies and disease germs are claimed to be analogous to the case at bar, it must be answered that in every case the activity or thing which has been held to be a nuisance has been something which was, 1, inherently harmful, and 2, an unreasonable and substantial interference with the ordinary use or enjoyment of property. No one can contend that light is inherently harmful to persons in the ordinary enjoyment of property." * * * .

"By way of summary, we have found no case in which it has been held that light alone constitutes a nuisance merely because it damaged one who was abnormally sensitive or whose use of his land was of a peculiarly delicate and sensitive character." * * *

"We do not say that the shedding of light upon another's property may never under any conditions become a nuisance, but we do say that extreme caution must be employed in applying any such legal theory. The conditions of modern city life impose upon the city dweller

and his property many burdens more severe than that of light reflected upon him or it."

In *Indian Refining Company* v. *Berry*, 226 Ky. 123, 10 S. W. 2d 630, the action by the plaintiff was to recover damages for injury to her residence caused by soot and smoke and odors from gasoline and oil originating in and emanating from a filling station operated by the defendant on an adjoining lot, by the unsightliness of the filling station, and by powerful electric lights used in its operation which interfered with the privacy of the home of the plaintiff. A recovery by the plaintiff was denied. In the opinion the court used this language: "It is not every annoyance, however, that will give a right of action to the person annoyed. The soot and smoke from the heating apparatus at the filling station cannot be different from the smoke and soot from other similar appliances in the vicinity. * * * . Consequently there can be no recovery for the soot and smoke originating in the stove at the filling station. The odors complained of arose from the gasoline and oil, and are not uncommon since the advent of automobiles. It is not shown that there is any reasonable way to operate a filling station without producing the odors of gasoline and oil. Such smells may be offensive to particular individuals, but there is nothing in this record to show any unusual or unnecessary operation of the plant, or violation of the rights of adjoining owners. It is equally true that a person has a right to erect and maintain electric lights on his premises, and people cannot complain that a neighbor uses numerous and brilliant lights on his own land. Light is essential to the operation of a filling station at night, and it is not shown that appellant used excessive or unnecessary illumination."

In 39 Am. Jur., Nuisances, Section 30, the text contains these pertinent statements: "In many cases, the question whether a nuisance has been created depends on the degree of injury done, for not every inconvenience, discomfort, or annoyance is sufficient to constitute a

nuisance. But what amount is necessary cannot be defined, and no precise rule can be laid down for determining it. It must be decided according to the circumstances of the particular case, and is largely a question of fact. There must be an appreciable, substantial, tangible injury resulting in actual, material, physical discomfort, and not merely a tendency to injure. It must be real and not fanciful or imaginary, or such as results merely in a trifling annoyance, inconvenience, or discomfort." See also *Higgins* v. *Decorah Produce Company*, 214 Iowa 276, 242 N. W. 109, 81 A. L. R. 1199; *Metzger* v. *Hockrein*, 107 Wis. 267, 83 N. W. 308, 81 Am. St. Rep. 841, 50 L. R. A. 305; *City of Janesville* v. *Carpenter*, 77 Wis. 288, 46 N. W. 128, 20 Am. St. Rep. 123, 8 L. R. A. 808.

The unsightliness of certain objects and structures present and used in connection with the business of the defendants is not sufficient to render such business a nuisance or to justify its abatement as such. "The fact that a thing is unsightly, or that it offends the aesthetic sense, is not in itself sufficient to make it a nuisance." and "Mere unsightliness or other conditions of a purely aesthetic nature are alone insufficient to justify a court's interference." 39 Am. Jur., Nuisances, Sections 29 and 70. "An owner's use of property cannot be restricted on purely aesthetic considerations." 66 C. J. S., Nuisances, Section 19d.

As already pointed out this Court, in *Parkersburg Builders Material Company* v. *Barrack*, 118 W. Va. 608, 191 S. E. 368, 192 S. E. 291, 110 A. L. R. 1454, refused to hold that an automobile wrecking business, located in a section of a city which was not an established residential community, constituted a nuisance merely because of its unsightliness. Though the majority opinion in that case contains statements to the effect that unsightly objects should be properly placed and not so located as to be unduly offensive to neighbors or the public, that an automobile filling station and tire repair shop may be a nuisance by reason of its location, and that a business not

pleasing to view should not be located in an unquestioned residential community, the soundness of the proposition that mere unsightliness alone does not create a nuisance or justify injunctive relief to abate it, and the support of that proposition by the weight of judicial authority, are convincingly demonstrated by the concurring opinion prepared by Judge Kenna; and the conclusion reached in that case rejects the theory that a nuisance results solely from aesthetic considerations. This Court has also rejected that theory in *State ex rel. Nunley* v. *Mayor and City Council of the City of Montgomery*, 94 W. Va. 189, 117 S. E. 888; *State ex rel. Sale* v. *Stahlman*, 81 W. Va. 335, 94 S. E. 497, L. R. A. 1918C, 77; and *Fruth* v. *Board of Affairs*, 75 W. Va. 456, 84 S. E. 105, L. R. A. 1915C, 981.

In the *Nunley* case this Court said that the unsightliness of a proposed garage, a permit for which was refused by the defendants for that reason and for other reasons, was not a valid ground for such refusal and in the opinion used this language: "The fourth reason is that the garage would be unsightly, very obnoxious and obectionable to the residents of said block. This reason is fully discussed in the case of *Fruth* v. *Board of Affairs*, 75 W. Va. 456. Judge Miller, in delivering the opinion of the court, says, referring to sec. 118 and 128 of Freund on Police Powers: 'The latter sections say, in accordance with the holdings of the courts everywhere, that mere beauty and symmetry of streets are for mere aesthtic purposes, having no reference to the safety, health and morals or general welfare of the community at large, the state may not under the police power regulate or control the use by the owner of private property.' *State ex rel. Graham Sale* v. *C. O. Stahlman et al*, 81 W. Va., 335, says in this connection: 'Nor can it be imposed to effect symmetry of the streets or section.' "

In the *Fruth* case an ordinance which undertook to establish a building line upon a street solely for aesthetic reasons was held to be invalid. Cases in other juris-

dictions which hold that an object which is unsightly or offends the aesthetic sense is not solely for that reason a nuisance and may not be abated on that ground alone are *Alabama Power Company* v. *Stringfellow*, 228 Ala. 422, 153 So. 629; *White* v. *Bernhart*, 41 Idaho 665, 241 P. 367, 43 A. L. R. 23; *Whitmore* v. *Brown*, 102 Me. 47, 65 A. 516, 9 L. R. A., N. S., 868, 120 Am. St. Rep. 454.

Though the adverse effect of the use of property, upon the value of other premises in the neighborhood, is a factor, it is not a controlling factor in determining the existence of a nuisance. 66 C. J. S., Nuisances, Section 19d. If the use of property does not create a nuisance, it may not be enjoined or a lawful business abated merely because it renders neighboring property less valuable, and there can be no recovery of damages for the diminution in value of neighboring property caused by the lawful use of property in the neighborhood. 66 C. J. S., Nuisances, Section 19d. "It is not enough that the act complained of diminishes the value of the plaintiff's property, or increases the rates of insurance on adjoining property, although depreciation in the market or rental value of his property may be a proper element of damages where a nuisance is otherwise established." 39 Am. Jur., Nuisances, Section 28. In *Indian Refining Company* v. *Berry*, 226 Ky. 123, 10 S. W. 2d 630, in which it was held that a gasoline filling station was not a nuisance the court said: "When the injury caused by the prosecution of a lawful business is not sufficient to constitute a nuisance in the legal sense, the mere fact that it depreciates the value of property does not give rise to a cause of action. *Pearson & Son* v. *Bonnie*, 209 Ky. 307, 272 S. W. 375, 43 A. L. R. 1166." In *Batcheller* v. *Commonwealth ex rel. Rector and Visitors of University of Virginia*, 176 Va. 109, 10 S. E. 2d 529, in which the location of an airport upon property adjoining the property of the plaintiff was held not to be a nuisance, the opinion contains these quotations from the case of *Swetland* v. *Curtiss Airports Corporation*, 41 F. 2d 929: "* * * if it be conceded that the property of the plaintiffs

will decrease in value if the airport is permitted to operate, that alone would not entitle the plaintiffs to an injunction. *Hazlett* v. *Marland Refining Co.*, 30 F. (2d) 808; 46 C. J. 682, Note 25. If the airport is not a nuisance, its operation may not be enjoined because to some extent the value of the plaintiffs' property will be decreased for the purpose to which it is now devoted." See also *O'Malley* v. *Macken*, 182 Minn. 294, 234 N. W. 323; *Dawson* v. *Laufersweiler*, 241 Iowa 850, 43 N. W. 2d 726. As the depreciation in the value of the properties of the plaintiffs, caused by the location and the operation of the business of the defendants, does not of itself constitute a nuisance, and as that business as presently conducted by the defendants is not a nuisance, the diminution in the value of the properties of the plaintiffs does not entitle them to injunctive relief.

For the reasons stated and under the authorities cited and discussed in this dissent, I would dissolve the injunction awarded by the circuit court and dismiss this suit at the cost of the plaintiffs.

Inasmuch, however, as the majority holds that the business as presently conducted by the defendants constitutes a nuisance in fact and the injunction, which the majority opinion concedes is "drastic", compels the defendants to discontinue the business which they are now conducting and to remove all of the fixtures from the lot owned by them, and inasmuch as I disagree with the statement in the majority opinion that "no modification can be made which will permit the efficient exercise of the defendants' rights to conduct this particular business at that place, and still protect the plaintiffs against the injury which must result to them therefrom", which in my judgment is not justified by the evidence, I would modify and limit the scope of the injunction to require the defendants to shorten the period of the use of the lights or to reduce their number or intensity, or both, or to prevent, by the use of appropriate shades, screens or hoods, their rays from extending to the properties of the plaintiffs, which the evidence shows can be done, and

with that restriction on the use of the lights, which would remove the main source of annoyance or inconvenience of which the plaintiffs complain, I would permit the defendants to retain and use on their property the articles and the equipment, which the injunction now requires them to remove, and to continue to operate their business at its present location. Without a just and proper modification of the injunction which would permit the defendants to continue the lawful business in which they are now engaged and which would prevent its complete destruction, the facility with which the hut, the lights, the poles and the displays necessary to the operation of their business, can be "transported and used at another location", as suggested in the majority opinion, is of no benefit to the defendants and offers them no satisfaction or no effective substitute for the compulsory loss and discontinuance of a lawful business.

In this instance the majority should have followed and applied the general rule with respect to the scope of the injunction. That rule is that "The decree should not enjoin more than that which constitutes the nuisance, and should never go beyond the requirements of the particular case. Where the injury complained of results from acts that are not a nuisance per se, but only such by reason of the manner in which they are done or the surrounding circumstances, the court will not grant an injunction in such form as absolutely to prohibit the defendant's use of his property, if it is possible to frame a decree which in another form will give the plaintiff the relief to which he is entitled." 39 Am. Jur., Nuisances, Section 172. See *McIntosh* v. *Brimmer,* 68 Cal. App. 770, 230 P. 203; *Bartlett* v. *Moats,* 120 Fla. 61, 162 So. 477; *Pigford* v. *State,* 184 Miss. 194, 183 So. 259; *Weaver* v. *Bishop,* 174 Okla. 492, 52 P. 2d 853; *Collins* v. *Wayne Iron Works,* 227 Pa. 326, 76 A. 24, 19 Ann. Cas. 991.

Recalling the pertinent expression of Judge Dent in his dissenting opinion in *Town of Davis* v. *Davis,* 40 W. Va. 464, 21 S. E. 906, in which this Court, being evenly divided, affirmed the judgment of a circuit court in up-

holding the action of a municipal council in abating a merry-go-round as a nuisance, that "The power to abate, if it exists, should never be exercised by a town council when the power to regulate will accomplish the same end without the destruction of property or of a lawful avocation.", I similarly assert that the power to abate, which resides in a court of equity, should not be exercised, as it has been in this case, when its power to regulate would accomplish a just and proper result "without the destruction of property or of a lawful avocation."

I am authorized to state that Judge Riley concurs in the views expressed in this dissenting opinion.