Frank A. GUNTHER, Jr., Frieda E. Gunther, Ethel E. Heath and Oscar C. Heath, Plaintiffs,

v.

E. I. DU PONT DE NEMOURS & CO., Inc., a corporation, Defendant.

Civ. A. No. 182–M.

United States District Court
N. D. West Virginia, at Martinsburg.
Dec. 12, 1957.

I. William Stempil, Washington, D. C., Guy R. Avey, Jr., Martinsburg, W. Va., for plaintiffs.

James C. McKay, of Covington & Burling, Washington, D. C., Walter D. Ford, Wilmington, Del., Clarence E. Martin, Jr., Martinsburg, W. Va., for defendant.

BOREMAN, District Judge.

This case involves demands for damages for personal injuries, damages for injuries to real property, and for injunctive relief.

### Introductory Review of Facts

The plaintiffs, Frank A. Gunther, Jr., and Frieda E. Gunther, husband and wife, hereinafter sometimes referred to as the Gunthers, reside in Silver Spring, Maryland, near Washington, D. C., where Mr. Gunther is employed as an officer of a bank. In 1948, the Gunthers purchased a tract of land in the Hedgesville district of Berkeley County, West Virginia, containing 25½ acres, and in 1949 purchased an adjacent tract containing about 5 acres. In 1950, a dwelling house was constructed on the smaller tract, which house is of concrete block construction, consisting of two bedrooms, a living room, kitchen and bath. There is an attic with flooring but no basement. The interior of the outside walls is painted with several coats of "stone set" and primer and flat wall paint. The inside partitions and the ceilings are of wallboard fastened to studding and ceiling joists. The joints between the wallboard and the outside walls are covered with a tape and are painted the same as the other surfaces. Heating is supplied from an oil burning heater.

The plaintiff, Ethel E. Heath, the wife of Oscar C. Heath, and her husband have resided since 1948 in a dwelling house owned by her daughter, Mrs. Hilda Grotz, located on Route 2, Hedgesville, Berkeley County, West Virginia.

Defendant, E. I. duPont de Nemours & Co., Inc., hereinafter called duPont,

owns and operates a modern plant for the manufacture of explosives, located on a 1,400-acre site with 51 operating buildings, and known as the Potomac River Works. This plant is the most complex of duPont's explosives operations and is one of the largest, if not the largest, explosives production plants in this country. It employs over 400 persons and the total payroll for the year 1956 was $2,400,000. Separated from said manufacturing plant but in the same general area, duPont established another plant known as the Potomac River Laboratory, used for the purpose of studying and improving the explosives manufactured by duPont. Safety in the use of explosives, increasing the quality and efficiency thereof, and lowering the cost to the consumer are some of the objectives. The laboratory represents an investment of over $800,000, employs approximately 40 persons and has an annual payroll of from $250,000 to $300,000.

In connection with the manufacture of explosives, duPont conducts two types of experiments which involve actual explosions of the product being tested, namely, "production" testing and "experimental" testing. The purpose of the former is to insure that a particular production "run" meets the requisite standards before being placed on the market. The latter involves new products, competitors' products, etc. A large part of the production of the Potomac River Works consists of an explosive sold under the trade name of "Nitromon", which is a very stable explosive and which cannot be detonated by kicks, jars, vibrations or even by a bullet fired from a rifle. The efficiency of a given weight of this explosive is almost equal to that of the same weight of nitroglycerin, but the latter is a very unstable explosive which is easily detonated. The usual method of using Nitromon is to explode it by use of a 14-pound primer composed of a less stable compound.

Before 1954 and up to the present time, duPont has tested relatively small quantities of explosives on the grounds of the Potomac River Works. However, one of the characteristics of Nitromon is that it cannot be exploded in small quantities. Since the buildings of the Potomac River Works are more or less centered in the 1,400 acres, the testing site there must, of necessity, be toward the perimeter of the area and within a few hundred yards of the homes in the neighborhood. The demand for Nitromon was increasing and duPont found it necessary to acquire a site where the larger quantities could be tested without undue annoyance to the inhabitants of the area. Various properties in the general vicinity of Martinsburg, West Virginia, were examined and on October 8, 1954, duPont leased from Mr. and Mrs. J. Arnold Haderer a tract of land in Hedgesville district of Berkeley County, West Virginia. DuPont actually took possession of the property on or about October 1, 1954, and since that time has been occupying it under and by virtue of the terms of the Haderer lease, and has been conducting the testings of explosives thereon.

The Haderer tract, hereinafter called the test site, is located approximately two air miles from the property of the Gunthers and one and one-half air miles from the property occupied by Mrs. Heath and her husband. It is about 15 miles from Martinsburg and about 6 miles from Hedgesville. The test site itself is located in the area known as White's Hollow, in rugged and hilly terrain, and in an area devoted largely to timbering and agricultural pursuits, and near a large tract of land owned by the State of West Virginia known as Sleepy Creek State Forest. Coal has been mined in the vicinity at various times and over a period of many years. The defendant's Exhibits Nos. 3 through 7, being photographs taken at the test site, show that the land adjacent to the cleared portions is fairly well covered with trees and underbrush.

Since the Gunthers built their dwelling house in 1950, they have occupied it intermittently on week ends, holidays, vacations and upon a few other occa-

sions until the present time. It is their desire to reside there permanently upon Mr. Gunther's retirement. The property upon which their house is located has been in Mrs. Gunther's family for over a hundred years, her mother having been born there. The Gunthers value their property at approximately $18,000 but indicated that they did not desire to sell it.

The evidence shows that the Heaths have heard the blasting at the test site since about September or October of 1954, but that the explosions were first heard by the Gunthers on December 2, 1954. On the following day, Mr. Gunther consulted an attorney at Martinsburg, West Virginia, and asked him to determine what could be done to stop the blasting. The attorney wrote several letters to duPont and met with duPont representatives on at least one occasion.

In the correspondence just mentioned, two items appear which may be recited here. One concerned the possibility that duPont might develop a vault or chamber in which the larger and heavier charges could be detonated and which would muffle and contain the noise. The evidence was uncontradicted that, although several thousand dollars had been expended in the attempt, such a test vault or chamber has not yet been perfected. The other item was in the nature of a suggestion that duPont might procure a test site in Sleepy Creek State Forest. Samuel Walker, Director of the Potomac River Laboratory, inspected several areas in the State Forest in company with the Forest Game Manager. It was Walker's opinion that none of the sites in the forest would be as good as the White's Hollow test site, and that any possible site in the forest would be, perhaps, closer to dwellings than the present site. The Forest Manager stated that he could not recommend any site in the forest for such use, as the objective of the State in acquiring the land was to provide recreational facilities for its citizens and visitors, which objective would be defeated by leasing a part of the forest preserve for commercial use.

On December 22, 1954, Mr. Gunther's attorney and three duPont officials visited various points in the area of the testing site while charges were being exploded. Further correspondence between the attorney and duPont continued for several months but it appears that the attorney-client relation between the attorney and Mr. Gunther ended thereafter.

### History of the Case

This action was instituted on July 2, 1956, by the Gunthers against duPont and Mr. and Mrs. J. Arnold Haderer. The Gunthers sought recovery of damages for injuries to their persons and to their real property, and an injunction against the continuance of the blasting operations by duPont at its test site. By order of this Court entered March 14, 1957, Mr. and Mrs. Haderer were dismissed as parties defendant for reasons stated in the order. By order of March 19, 1957, Oscar C. Heath and Ethel E. Heath were allowed to join as parties plaintiff. The Heaths requested the same type of relief as did the Gunthers and, in addition, claimed damages for the destruction of a poultry and egg-hatching business operated by them and their daughter, Mrs. Grotz.

DuPont then moved for partial summary judgment in its favor, and said motion was granted in part and denied in part by order entered August 12, 1957. In essence, that order provided:

(1) By virtue of the Limitation of Actions Statute of West Virginia, Code, 55–2–12, the Gunthers could not recover for any alleged personal injuries sustained prior to July 3, 1955;

(2) The Heaths could not recover for any alleged injuries to the real property on which they resided since they were not the owners thereof; and for the same reason, they are not entitled to an injunction against duPont;

(3) Oscar C. Heath has no valid claim for personal injuries, and the claim of Ethel E. Heath for personal injuries could be sustained only on the theory of negligence by duPont in its testing operations;

(4) By virtue of the Limitation of Actions Statute of West Virginia, Ethel E. Heath could not recover for any alleged personal injuries sustained prior to March 19, 1956;

(5) The Heaths could not recover for any alleged injuries or damage to the poultry and egg-hatching business.

Thus, at the time of trial, the Gunthers and Mrs. Heath were seeking damages for personal injuries, the Gunthers were asking damages for injuries to their real property, and the Gunthers were seeking to enjoin the testing activities of duPont at the test site on the theory that such operations constituted a continuing private nuisance.

A pre-trial conference of this case was held on August 6, 1957, at which time the Court was familiar with the case of Spears v. Goldberg, decided by the Supreme Court of West Virginia and reported in 122 W.Va. 514, 11 S.E.2d 532, 12 S.E.2d 513, wherein it was held, in effect, that what constitutes a nuisance is a question of law for the Court, but ascertainment and determination of the facts, whereon judicial pronouncement may be based in a given case, is a jury matter. The instant case involves requests for both legal and equitable relief and, in order to follow the proper procedure as announced by the Supreme Court of West Virginia, this Court was of the opinion that certain issues of fact should be submitted to a jury. Accordingly, it was ordered that the jury first be required to answer interrogatories as to those issues after instruction by the Court with respect thereto. If such answers so required, the Court would then further instruct the jury as to the ascertainment of damages and would pass upon the claim to injunctive relief.

At the close of the plaintiffs' evidence, duPont moved that the jury be directed to return verdicts in its favor and against Mrs. Heath and Mr. Gunther on their claims for personal injuries. In order to recover upon her claim, it was incumbent upon Mrs. Heath to show, by a preponderance of the evidence, that some negligent act of duPont was the proximate cause of her alleged personal injuries. The Court, believing that there was no showing whatsoever of negligence on the part of duPont, ruled accordingly. Mr. Gunther introduced no evidence of injury to his person and, in fact, admitted on the witness stand that he had not been physically injured. It was, therefore, the duty of the Court to direct the jury to return a verdict against him and in favor of duPont on this claim.

Certain interrogatories were submitted to the jury as follows:

Interrogatory No. 1. "Has the real property of the plaintiffs, Mr. and Mrs. Gunther, been physically damaged as the proximate result of explosives testing operations conducted by the defendant at its testing site?"

Interrogatory No. 2. "Has the plaintiff, Mrs. Gunther, suffered and sustained personal injuries since July 3, 1955, up to the present time as the proximate result of explosives testing operations conducted by the defendant at its testing site?"

Interrogatory No. 3. "Do the explosives testing operations of the defendant at its testing site interfere with, interrupt or adversely affect the reasonable, proper and safe use and enjoyment of the real estate of the plaintiffs, Mr. and Mrs. Gunther?"

Interrogatory No. 4. "Do the explosives testing operations of the defendant constitute, under all the circumstances and conditions as detailed in the evidence, an unreasonable use of its testing site?"

After deliberating at some length, the jury returned into court and, when questioned by the Court as to whether or not they had agreed upon the answer to each interrogatory, the foreman of the jury announced that interrogatories Nos. 1, 2 and 4 had been answered in the negative but the members of the jury were still discussing their answer to interrogatory No. 3. The Court asked the jury to return to the jury room for further deliberation, and shortly thereafter

counsel for the plaintiffs and counsel for the defendant announced their agreement that interrogatory No. 3 should be withdrawn from further consideration by the jury, which was accordingly done. The Court believed that it would be improper to disturb the jury's findings with respect to the questions propounded in interrogatories Nos. 1 and 2. Interrogatories Nos. 3 and 4 were submitted to the jury as a possible guide to the Court in reaching a determination as to whether the operations of duPont at the test site constitute a private nuisance, and if so, whether such operations should be enjoined.

### Opinion of the Court

█ In reaching and explaining its ultimate decision, the Court is of the opinion that it is necessary to review the evidence relied upon by both sides.

It is not disputed that a separation of the ceiling from the outside wall had occurred in the Gunthers' dwelling house. It appears that neither the wall nor the ceiling had cracked or broken, but that the tape attached to and joining the two surfaces had become loosened. The Gunthers testified that this crack or separation was caused by some particularly heavy blasting by duPont on December 2, 1954. There was evidence that similar cracks had appeared in at least one of the bedrooms at a later date, as well as a crack in the kitchen over the cooking stove. The Gunthers claim that these cracks have enlarged because of the continued blasting by duPont. It was admitted that the Gunther home was occupied only intermittently and, on cross-examination, Mr. Gunther testified that during the winter the house was not heated when unoccupied unless the weather turned "very cold". He further testified that in such case, one of Mrs. Gunther's uncles, who lived only a short distance from the Gunther property, would light the oil burning heater. Upon this evidence, duPont predicated its theory and argument that the cracks and separations were due to the extremes in temperature changes. To buttress this

contention, duPont introduced evidence as to the different coefficients of expansion of concrete blocks, wood and wallboard. A witness for duPont, who had inspected the Gunther property, asserted his opinion that the broken and loosened tape had been improperly installed and not according to approved and accepted methods. It may be noted here that almost all of the cracks and separations occurred at the junctions of interior panels and the outside walls of the house, where any effect of varying temperatures between the inside and outside would be most pronounced. The ceiling above the cooking stove in the kitchen would be particularly subject to varying temperature conditions.

The Gunthers also claimed that their well water became discolored and unfit for use after duPont commenced its testing operations at the test site. DuPont claimed that such discoloration was due to rust in the metal pipes leading into the well and that this condition was alleviated when plastic pipe was installed.

█ During the course of the trial, the Court admitted certain evidence which tended to show that the test blasting had injured other houses and properties in the vicinity of the test site. The jurors were instructed that even if they believed that such damage had, in fact, been caused by the test blasting, that evidence could not be accepted by them as the sole basis for a finding that the Gunther property had been so injured, but was to be considered as only one of a number of factors to be taken into consideration in reaching a decision. However, the Court believes such evidence to be relevant to the issue of whether duPont's activities constitute a nuisance. For this reason, the Court will briefly review some of this testimony.

Amos C. VanHorn, who lives about three miles from the test site, testified that, after the testing operations began, his well water became milky and diminished in volume. Willard Shriver, living about two miles away, stated that the plaster in his house had cracked, his well

water became muddy after the blasting started and that, at each blast, "sandy dust" falls from the ceiling. Mrs. Edith Walburn stated that the plaster in her house, which plaster had been there for twenty-five years, cracked after duPont began blasting. Harry and Calvin Shriver, uncles of Mrs. Gunther, and who live near the Gunther residence, found a crack in their chimney after the blasting started. Kathleen Weigle, who lives about two miles from the test site, asserted that the blasting had "busted" four windows in her house and that nails were pulling out of the shingles and mortar was falling from between the bricks due to the jarring. Mrs. Naomi Keesecker, who lives about three miles from the Gunther property, blamed the blasting for shattering two panes of glass in the same window, on two different occasions. Oscar C. Heath testified that the blasting had caused cracks in the chimney, walls and window sills of the Grotz house in which he and his wife reside. Mrs. Lucy Murphy, who lives a little over a mile from the Gunther property, said that two windows in her house had been blown out and broken, but that the wind might have been the cause instead of the blasting. Mrs. Nellie Wood testified in court that the paper on the walls of her dwelling house had cracked and that two windows had cracked because of the blasting but, in a signed statement given to duPont representatives (Plaintiffs' Exhibit No. 26), she had said that there had been no damage to her property.

To rebut this evidence, duPont produced a number of witnesses from the same general locality and otherwise situated similarly to plaintiffs' witnesses, who testified that their property had not been damaged by the test blasting. In addition, there was evidence that the water in the Hedgesville area tended to rust pipes more rapidly than other water due to chemical reaction; that the damage to the Heath residence might have been caused by frost and by fire in the chimney; that in other plastered interiors, no cracks had appeared since the blasting began and, in some cases, existing cracks in the plaster had not been affected.

Testimony of expert witnesses was also produced on behalf of duPont. An expert in the field of seismology, Dr. Lewis Don Leet, of Harvard, stated that, in his opinion, the charges exploded by duPont could not possibly have caused the real property damage complained of by the Gunthers. He based his opinion on the weight of the charges detonated, the topography of the land, the distances involved, tables prepared from extensive surveys of the effects of blasting, and measurements of the vibrations and the sound levels taken at the Gunther residence and the Heath residence.

On March 14, 1957, pursuant to a motion previously made by duPont, the plaintiffs were ordered to allow duPont to inspect, photograph and conduct tests on the plaintiffs' premises at reasonable times and under reasonable conditions. These tests were conducted on March 15, 1957, by Dr. Leet. Dr. Leet prepared a report of his findings and he testified from the report (Defendant's Exhibit No. 24). Briefly, four shots of approximately fifty pounds were exploded with Dr. Leet's seismograph located at different points in the Gunther residence. The same procedure was followed at the Heath residence. At the Gunther house, shot No. 3 was apparently the most noticeable as it was recorded as vibrating the house .0032 inches, at a frequency of fifteen cycles per second. Regulations adopted in Massachusetts and New Jersey (Defendant's Exhibits No. 22 and No. 23) allow a vibration of .020 inches at this frequency. The stamping of a foot on the floor by the operator of the seismograph measured .020 inches vibration. This is but one example cited by the witness as the other shots had varied results, depending on the location of the instrument and the location of the shot.

After all of the above and much more evidence was presented to the jury and to the Court, the Court instructed the jury to the effect that the testimony of an expert witness is not to be accepted

**32**

as truth per se, but must be judged as to weight and credibility by the same rules applicable to the testimony of other witnesses. We must presume that the jury followed instructions in deciding that the test blasting by duPont was not the proximate cause of the alleged damage to the Gunther real property. Under all the facts and circumstances and after reviewing the evidence, the Court agrees with the finding of the jury that the blasting has not physically injured the Gunthers' real property and, therefore, the Gunthers must show some other basis to sustain their claim that the testing operations constitute a nuisance.

■ It is well settled in West Virginia that noise alone may create a nuisance, depending on time, locality and degree. Snyder v. Cabell, 1886, 29 W.Va. 48, 1 S.E. 241; Ritz v. Woman's Club, 1934, 114 W.Va. 675, 173 S.E. 564, 182 S.E. 92; Martin v. Williams, W.Va.1956, 93 S.E.2d 835, Comment, 59 W.Va.L.R. 92 (1956). Using these factors as a guide, an analysis of the pertinent evidence is indicated.

■ It appears undisputed that the blasting at the test site averaged two to three days a week, beginning around 9:30 A.M. and concluding by 3:30 or 4:00 P.M. No testing at the test site was done on Saturdays, Sundays, holidays or at night, and since 1954 there has been no test blasting during the deer hunting season. The weight of the explosive materials averaged less than forty pounds, and a weight of fifty pounds was the maximum allowed without special permission from the director of the Potomac River Laboratory. On a few occasions, with such permission, the weight of the shots did not exceed sixty pounds. There was no evidence given by any independent witness that dust, debris or fumes had come upon any of the surrounding residential area, and those witnesses to whom such a question was propounded expressly denied such an occurrence. Testimony of parents was given to the effect that children took naps during the explosives testing and were not disturbed. At least one

adult, who worked at night and slept during the day, stated that he had not been bothered or awakened by the blasting. The noise of the blasting was variously described by witnesses as "fairly loud", "a thud", "loud", "of medium loudness", "right loud", "quite a noise", "a clap of thunder", "heavy thunder", "distant thunder", "a little racket", and so on. Dr. Leet compared the noise to that of a door slam but the Court believes that this is not particularly descriptive since some doors, due to their construction and the nature of the room into which they lead, simply do not "slam" in the ordinary sense of the word, even though uncontrolled by mechanical devices. On the other hand, we all know from practical experience that some doors make a terrific noise when closed with violence.

Mrs. Gunther stated that she was frightened by each test explosion and became nervous and upset. However, she admitted that she was quite nervous over the pending litigation and that she became nervous when she drove a car in traffic or went shopping. The evidence disclosed that Mrs. Gunther has suffered from a nervous disorder almost all of her adult life. She testified that the explosions had not interfered with her sleep, her social life, conversations or the entertainment of guests. In fact, none of the witnesses for either side claimed that the explosions had an adverse effect on these particular facets of living. Such was expressly negated by many witnesses. Mr. Gunther stated that the test blasting did not make him nervous, but that it did make him angry. There was testimony by both Mr. and Mrs. Heath that they were made extremely nervous by the explosions.

■ It may be argued that the testimony of other witnesses should not preponderate against the subjective discomfort professed by Mrs. Gunther. The Court does not so understand the law of nuisances. Whether a particular activity constitutes a nuisance depends on its effect on a person of ordinary sensibilities, *not* the effect on a particular individual. Bragg v. Ives, 1929, 149 Va.

482, 140 S.E. 656; Holton v. Northwestern Oil Co., 1931, 201 N.C. 744, 161 S.E. 391. Cf. Ritz v. Woman's Club, supra.

The Gunthers claim that they are entitled to injunctive relief because (1) the blasting has injured and continues to injure their real property; (2) the blasting has physically injured Mrs. Gunther by aggravating a previously existing condition; and (3) the test blasting has interfered with the enjoyment of their property and has caused it to depreciate in value.

■■ As mentioned heretofore, the jury found that the test explosions have not injured the property of the Gunthers or the person of Mrs. Gunther. The Court agrees with the findings of the jury in these particulars. How then has the enjoyment of the property been lessened, in the sense that a court should or will grant injunctive relief? The Court believes it a fair inference from the evidence that the Gunthers' enjoyment of their property was lessened because *they believed* that the test blasting had injured them. If such belief is unfounded, what is left other than depreciation in value? Mere diminution of the value of property because of the use to which adjoining or nearby premises is devoted, if unaccompanied with other ill results, is *damnum absque injuria*—a loss without injury, in the legal sense. Martin v. Williams, supra. A nuisance is that class of wrongs which arises from the unreasonable, unwarranted or unlawful use of one's property which produces such material annoyance, inconvenience, discomfort or hurt that consequential damage is presumed. Pope v. Edward M. Rude Carrier Corp., 1953, 138 W.Va. 218, 75 S.E.2d 584. In the present case, the jury, in answering interrogatory No. 4, stated that duPont was not using the test site unreasonably. The testing operations, in themselves, are not unlawful in any particular and there was absolutely no evidence introduced indicating that duPont failed to use due care in conducting its testing activities. The jury did not answer interrogatory No. 3 and the same was withdrawn from the jury at the request of counsel. This interrogatory would have required the jury to say whether duPont's activities adversely affected the reasonable, proper and safe use of the Gunthers' property, but the jury did say, in answer to other interrogatories, that the blasting caused no property damage or personal injuries. Mrs. Gunther said that there had been no interference with her sleep, social life or other usual home activities. In the Court's view of this case, the Gunthers have shown no other factors, interference with which would constitute a private nuisance.

After taking into consideration all of the facts and circumstances as shown by the evidence, and in accordance with the rules of law heretofore cited, the Court is of the opinion that duPont's activities have not adversely affected the reasonable, proper and safe use of the Gunthers' property and that the plaintiffs, the Gunthers, are not entitled to the extraordinary remedy of injunction.

■ The Court is of the opinion that sufficient reasons have already been stated as a basis for refusing the injunction. However, let us assume that the evidence adduced on behalf of the Gunthers is sufficient in law to show that a nuisance does exist. Even so, it does not necessarily follow that an injunction order, abating the nuisance, must be issued. The Supreme Court of Appeals of West Virginia has, in several cases, applied the doctrine of "weighing the equities". Other terms applying the same rule are "the balance of injury", "comparative hardship" and "balance of convenience". An apt definition pronounced by the West Virginia Court is that "a court of equity has discretion to refuse relief where the benefits to a plaintiff are small and insignificant as compared with the damage and inconvenience done to defendant if the relief to plaintiff was granted". Beard v. Coal River Collieries, 1927, 103 W.Va. 240, 247, 137 S.E. 7, 10. See Brokaw v. Carson, 1914, 74 W.Va. 340, 81 S.E. 1133; Powell v. Bentley & Gerwig Furniture Co., 1891, 34 W.Va. 804, 12 S.E. 1085, 12

L.R.A. 53; Ritz v. Woman's Club, 1934, 114 W.Va. 675, 173 S.E. 564, 182 S.E. 92; City of Wheeling v. Natural Gas Co., 1914, 74 W.Va. 372, 82 S.E. 345; Chafin v. Gay Coal & Coke Co., 1930, 109 W.Va. 453, 156 S.E. 47; Martin v. Williams, W.Va.1956, 93 S.E.2d 835.

There was evidence in this case that prohibiting further use of the White's Hollow test site would seriously interfere with, if not terminate, explosives manufacturing by duPont in the Martinsburg area. Since the Court is of the opinion that evidence in this case is insufficient to show that a nuisance in fact exists, it is unnecessary to decide whether the equities in this case weigh in favor of one side or the other; the purpose of this discussion is merely to point out that even if the evidence should be viewed as supporting a conclusion opposite to that reached by the Court, the Gunthers are not entitled to an injunction as a matter of right.

While certain facts have been stated in the foregoing portion of this opinion and in the statement of the conclusions reached by the Court, certain material findings of fact and conclusions of law are hereinafter summarized.

### Findings of Fact

1. Plaintiff, Frank A. Gunther, Jr., has suffered no physical injuries which are in any way connected with his occupancy of the property in Hedgesville district of Berkeley County, West Virginia, or with the explosives testing operations of the defendant.

2. The explosives testing operations of duPont at its testing site have not been conducted negligently, recklessly or wantonly.

3. The real property of the plaintiffs, Mr. and Mrs. Gunther, has not been injured or damaged as the proximate result of the explosives testing operations conducted by the defendant at its testing site.

4. The plaintiff, Frieda E. Gunther, has not suffered personal injuries since July 3, 1955, up to the time of the trial as the proximate result of explosives testing operations conducted by the defendant at its testing site.

5. The explosives testing operations of duPont at its testing site did not interfere with, interrupt or adversely affect the reasonable, proper and safe use and enjoyment of the real property of the plaintiffs, the Gunthers.

6. The explosives testing operations of duPont do not constitute, under all the circumstances and conditions as detailed in the evidence, an unreasonable use of its testing site.

### Conclusions of Law

1. The plaintiff, Ethel E. Heath, is not entitled to recover damages from the defendant for injuries to her person.

2. Neither the plaintiff, Frank A. Gunther, Jr., nor the plaintiff, Frieda E. Gunther, is entitled to recover damages from the defendant for personal injuries.

3. The Gunthers are not entitled to recover damages from the defendant for injuries to their real property.

4. The plaintiffs, the Gunthers, are not entitled to an injunction abating the explosives testing operations conducted by duPont.

Ordered accordingly.